[No. S082782. Feb. 4, 2002.]

HARTWELL CORPORATION et al., Petitioners, v.
THE SUPERIOR COURT OF VENTURA COUNTY, Respondent;
KRISTIN SANTAMARIA et al., Real Parties in Interest.

[And eight other cases.*]

---

*Boswell v. Superior Court* (No. A085482); *Celi v. Superior Court* (No. A085486); *Adler v. Superior Court* (No. A085488); *Suburban Water Systems v. Superior Court* (No. A085495); *Covina Irrigating Co. v. Superior Court* (No. A085496); *San Gabriel Valley Water Co. v. Superior Court* (No. A085501); *Southern California Water Co. v. Superior Court* (No. A085502); *Santamaria v. Suburban Water Systems* (No. A085761).

**COUNSEL**

Carroll, Burdick & McDonough, N. Kathleen Strickland, Donald T. Ramsey, Jack T. Friedman, Elizabeth L. Zepeda; Holland & Knight, N. Kathleen Strickland, Donald T. Ramsey and Devin C. Courteau for Petitioners The Hartwell Corporation, Rubber Urethanes, Inc., Screwmatic, Inc., J.H. Mitchell & Sons Distributors, Fairchild Industries, Azusa Land Reclamation Company, Inc., and Oil and Solvent Process Company.

Beveridge & Diamond, James L. Meeder, Janet C. Loduca; Allen Matkins Leck Gamble & Mallory, James L. Meeder and Alexander C. Crockett for Petitioners Mobil Oil Corporation, Lockheed-Martin Corporation and The Valspar Corporation.

Law Offices of David C. Solinger, David C. Solinger; Resolution Law Group, Philip C. Hunsucker, Michael O. Nelson and Andrea J. Greenberg for Petitioners Whico Machine, Inc., Donald White and John White.

Gallagher & Gallagher, Timothy V. P. Gallagher, Thomas C. Sites and Martin N. Refkin for Petitioner Oil and Solvent Process Company.

Engstrom, Lipscomb & Lack, Walter J. Lack, Gary A. Praglin, Joy L. Robertson, Michele Hitt; Girardi & Keese, Thomas V. Girardi; DeWitt, Algorri & Algorri and Mark Steven Algorri for Petitioners and Real Parties in Interest Christine Boswell et al., Loretta Celi et al., and Jeff Adler et al.

McKenna & Cuneo and Joseph F. Butler for Petitioners and Real Parties in Interest Covina Irrigating Company and California Domestic Water Company.

Lagerlof, Senecal, Bradley & Swift and Andrew D. Turner for Petitioner and Real Party in Interest California Domestic Water Company.

Lemieux & O'Neill, W. Keith Lemieux and Steven P. O'Neill for Petitioners and Real Parties in Interest San Gabriel County Water District and Valley County Water District.

Proskauer Rose, Aaron P. Allan, Barry C. Groveman, Gregory J. Patterson; Musick, Peeler & Garrett, Barry C. Groveman; Timothy J. Ryan; Chapin Shea McNutt & Carter and Steven J. Renshaw for Petitioner and Real Party in Interest San Gabriel Valley Water Company.

Haight, Brown & Bonesteel, Gary C. Ottoson, Rita Gunasekaran; Bacalski, Byre & Koska, William K. Koska; Hatch & Parent, Steven A. Amerikaner and Scott S. Slater for Petitioner and Real Party in Interest Southern California Water Company.

Daniels, Baratta & Fine, Daniels, Fine, Israel & Schonbuch, Mary Hulett, Mark A. Vega, Paul Fine; Ragsdale Liggett and Mary Hulett for Petitioners and Real Parties in Interests Surburban Water Systems and Southwest Water Company, Inc.

Crosby, Heafey, Roach & May, Randall D. Morrison and Joan M. Haratani for Petitioner and Real Party in Interest Baxter Healthcare Corporation.

Shapiro, Mitchell & Dupont, Shapiro & Dupont, Shapiro, Borenstein & Dupont and Norman A. Dupont for Petitioner and for Real Party in Interest Reichhold.

No appearance for Respondent Superior Court.

McCutchen, Doyle, Brown & Enersen, John R. Reese, Barry P. Goode, Jill F. Cooper, Eric F. Pierson and Lonnie Finkel for Real Party in Interest Wynn Oil Company.

Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, Patricia L. Glaser, Terry Avchen, David A. Giannotti and Jan Jensen for Real Party Interest Huffy Corporation.

Morgan, Lewis & Bockius, Jeffrey N. Brown, Steven J. Oppenheimer and Wendy K. Kilbride for Real Party in Interest Avery Dennison Corporation.

Munger, Tolles & Olson and Peter R. Taft for Real Party in Interest Aerojet General Corporation.

Belcher, Henzie & Biegenzahn, E. Lee Horton, John S. Curtis, Scott J. Leipzig; Steefel, Levitt & Weiss, Lenard G. Weiss, Mark Fogelman; and Jan S. Driscoll for Real Party in Interest California-American Water Company.

Rose, Klein & Marias, Barry I. Goldman, Dennis J. Sherwin, David A. Rosen, Christopher P. Ridout and Arlyn M. Latin for Real Parties in Interest Kristin Santamaria et al.

Horvitz & Levy, Frederic D. Cohen and David S. Ettinger for California Water Association as Amicus Curiae.

## OPINION

**CHIN, J.**—Plaintiffs, residents of the San Gabriel Valley in Southern California, filed lawsuits in superior court, alleging, inter alia, that certain water companies provided them unsafe drinking water causing death, personal injury, and property damage. Public Utilities Code section 1759,[1] however, precludes superior court jurisdiction to review any order or decision of the California Public Utilities Commission (PUC) or to interfere with the PUC in the performance of its official duties. We granted review in this case to determine whether section 1759 bars the superior court actions. As explained below, we conclude that the PUC's regulation of water quality and safety does not preempt damage claims alleging violations of federal and state drinking water standards against the water providers subject to PUC regulation, but that the remaining claims against those water providers are preempted. We further conclude that the causes of action against those defendants not subject to PUC regulation are not barred.

### PROCEDURAL HISTORY

#### A. *Superior Court Actions*

##### 1. *Adler, Celi and Boswell Actions*

Three groups of plaintiffs, Jeff Adler and over 100 coplaintiffs, Loretta Celi and about 20 other plaintiffs, and Christine Boswell and 13 other plaintiffs, each filed separate actions for damages in the Los Angeles County Superior Court. The Adler complaint named as defendants Southern California Water Company, California American Water Company, and eight corporate parties that are not water providers or regulated by the PUC (hereafter

---

[1]Unless stated otherwise, all statutory references are to the Public Utilities Code.

referred to as industrial defendants). The Celi complaint named as defendants San Gabriel Valley Water Company and the same eight industrial defendants. The Boswell complaint named as defendants Suburban Water Systems, Southwest Water Company, Covina Irrigating Company, California Domestic Water Company, and the same industrial defendants named in the Adler and Celi complaints. Southern California Water Company, California American Water Company, San Gabriel Valley Water Company, Suburban Water Systems, and Southwest Water Company are water providers subject to PUC regulation (hereafter referred to as regulated utilities). Covina Irrigating Company and California Domestic Water Company are public water districts and mutual water companies not subject to PUC regulation (hereafter referred to as nonregulated water providers).

The complaints sought damages based on causes of action for negligence, strict liability, trespass, public and private nuisance, and fraudulent concealment. Some plaintiffs also sued for wrongful death. These causes of action were based on the following allegations: that defendant water companies had provided the contaminated well water to plaintiffs, longtime residents of the San Gabriel Valley, over a period of years; that the water contaminants included trichloroethylene, perchloroethene, carbon tetrachloride, and perchlorates; and that as a result, plaintiffs suffered physical and mental pain and suffering, including fear of cancer, and property damage. The complaints further alleged that the industrial defendants disposed of toxic substances in the ground.

2.  *Santamaria Action*

Kristin Santamaria and some 300 coplaintiffs filed a separate action in Los Angeles County against many of the same defendants. The complaint named additional industrial defendants, as well as nonregulated water providers Valley County Water District and San Gabriel County Municipal Water District. In addition to the same causes of action contained in the Adler, Boswell and Celi complaints, the Santamaria complaint alleged conspiracy, battery, and nine causes of action for unfair business practices based on the same kinds of conduct and toxic substances in the drinking water as alleged in the other lawsuits. The Santamaria plaintiffs prayed for damages, as well as injunctions against disposing toxic materials, supplying contaminated water, and engaging in unlawful business practices. They also sought medical monitoring, a constructive trust against defendants' property to pay for plaintiffs' injuries, and an order compelling defendants to disgorge profits and restore money acquired through unlawful business practices.

The court changed the venue of the Santamaria action to Ventura County on motion of several defendants.

## B. *PUC Investigation*

In response to the lawsuits filed against the regulated utilities, the PUC filed an order instituting an investigation on March 12, 1998. (Cal.P.U.C. Order Instituting Investigation No. 98-03-013 (Mar. 12, 1998) [1998 Cal.P.U.C. Lexis 73].) Concerned that the complaints "raise public concerns over the safety of the drinking water supplies of these utilities," (*id.*, 1998 Cal.P.U.C. Lexis 73 at p. 2) the PUC instituted "a full-scale investigation" (*id.*, 1998 Cal.P.U.C. Lexis 73 at p. 3) to determine (1) whether current drinking water standards adequately protect the public health and safety; (2) whether the regulated utilities have complied with those standards; (3) what remedies should apply for noncompliance with safe drinking water standards; and (4) whether the occurrence of temporary excursions of contaminant levels above regulatory thresholds are acceptable "taking into consideration economic, technological, and public health and safety issues, and compliance with Public Utilities Code Section 770." (Cal.P.U.C. Order No. 98-03-013, *supra*, 1998 Cal.P.U.C. Lexis 73 at p. 10.) The PUC limited its investigation to the operations and practices of the named defendant public utilities and all other class A and class B public utility water companies,[2] which collectively serve over 90 percent of all public utility water customers in California. (Cal.P.U.C. Order No. 98-03-013, *supra*, 1998 Cal.P.U.C. Lexis 73 at p. 4.)

Plaintiffs in all four actions intervened in the PUC's investigation. They moved to dismiss or limit the investigation, on the ground the PUC lacked subject matter jurisdiction over the quality of drinking water service provided by regulated utilities. On June 10, 1999, the PUC issued an interim opinion denying plaintiffs' motion. (Cal.P.U.C. Interim Opinion Denying Motions Challenging Jurisdiction to Conduct Investigation 98-03-013 (June 10, 1999) Dec. No. 99-06-054 [1999 Cal.P.U.C. Lexis 312].) Rejecting plaintiffs' jurisdictional argument, the PUC found that it possessed authority to regulate the quality of the service and the drinking water that the water utilities provide, that it had exercised such authority for decades, and that it continued to do so. It determined that its jurisdictional decision was final and thus subject to rehearing and appellate review. On September 16, 1999, the PUC denied plaintiffs' application for rehearing. (Cal.P.U.C. Order Modifying Decision 99-06-054 For Purposes of Clarification and Denying Rehearing (Sept. 16, 1999) Dec. No. 99-09-073 [1999 Cal.P.U.C. Lexis 594].)

---

[2]Class A utilities are those with more than 10,000 service connections. Class B utilities have more than 2,000 connections. (Cal.P.U.C. Final Opinion Resolving Substantive Water Quality Issues (Nov. 2, 2000) Dec. No. 00-11-014 [2000 Cal.P.U.C. Lexis 722, 1, fn. 1].)

Plaintiffs did not seek review of the PUC's jurisdictional decision in this court under section 1756.[3]

The regulated utilities, the California Department of Health Services (DHS), the water division staff of the PUC, and some of the industrial defendants in the lawsuits participated in the investigation. After 31 months of investigation and study, the PUC issued its "Final Opinion Resolving Substantive Water Quality Issues" on November 2, 2000. (Cal.P.U.C. Final Opinion Resolving Substantive Water Quality Issues, *supra*, Dec. No. 00-11-014 [2000 Cal.P.U.C. Lexis 722].) The PUC concluded that existing DHS drinking water quality standards adequately protect the public health and safety and that, over the past 25 years, the regulated utilities, including defendants in these lawsuits, had provided water that was " 'in no way harmful or dangerous to health' " and had satisfactorily complied with DHS drinking water quality requirements. (Cal.P.U.C. Dec. No. 99-06-054, *supra*, 1999 Cal.P.U.C. Lexis 312 at p. 39.) It also gave notice of its intention to initiate a future investigation or rulemaking proceeding to investigate specific water quality issues. (Cal.P.U.C. Dec. No. 00-11-014, *supra*, 2000 Cal.P.U.C. Lexis 777 at pp. 71, 73-74.)[4]

## C. *Superior Court and Court of Appeal Rulings*

In the meantime, in response to PUC Order No. 98-03-013 instituting an investigation of water quality safety, defendants in the four superior court actions sought dismissal on the ground that the litigation was barred by section 1759. In the alternative, certain defendants requested stays of the court proceedings pending the PUC's investigation. On June 24, 1998, the superior court in the Adler, Celi, and Boswell actions stayed all proceedings until the completion of the PUC's investigation. On August 27, 1998, the Ventura County Superior Court in the Santamaria action sustained the regulated utilities' demurrers without leave to amend, but overruled the

---

[3]Plaintiffs withdrew as interveners after the PUC's denial of the motion to dismiss. (Cal.P.U.C. Final Opinion Resolving Motions to Compel Discovery and Motions to Withdraw From Proceeding (Nov. 21, 2000) Dec. No. 00-11-036.)

[4]The Court of Appeal granted judicial notice of all proceedings before the PUC, including PUC Decision No. 99-06-054. However, the PUC's modification order and denial of rehearing, its final opinion resolving motions to compel discovery and to withdraw from proceeding, and its final opinion resolving the substantive water quality issues occurred after the filing of the Court of Appeal opinion. The regulated utilities request that we take judicial notice of the modification order and denial of rehearing and the final opinion resolving motions to compel discovery and to withdraw from proceedings. Several of the industrial defendants join the regulated utilities in requesting that we take judicial notice of the PUC's final opinion in its investigation. Because the subsequent PUC proceedings are a continuation of the PUC's investigation into water quality safety issues, we grant those requests. (*Pratt v. Coast Trucking, Inc.* (1964) 228 Cal.App.2d 139, 143-144 [39 Cal.Rptr. 332].)

demurrers of the nonregulated water providers and the industrial defendants and denied their motions for a stay of proceedings. The court later accepted a stipulation that the proceedings be stayed pending review by the Court of Appeal.

Eight petitions for writs of mandate were filed in the Court of Appeal. The Adler, Celi, and Boswell plaintiffs and the regulated utility defendants filed petitions challenging the stay orders of the Los Angeles County Superior Court. In the Santamaria action, the nonregulated water providers and the industrial defendants filed petitions challenging Ventura County Superior Court's overruling of the demurrers and denial of the motions for a stay, while the plaintiffs appealed the order granting the demurrer of the regulated utility defendants. The Court of Appeal issued orders to show cause on the petitions and consolidated the appeal with the proceedings on all of the writs.

On September 1, 1999, the Court of Appeal ruled that the PUC's statutory authority over water quality and its exercise of jurisdiction in addressing water quality issues preempted the four actions against the regulated utilities, but did not preempt the actions against the nonregulated water providers and the industrial defendants. Accordingly, it ruled that the Los Angeles County Superior Court in the Adler, Celi, and Boswell actions erred (1) in staying the proceedings instead of ruling on the merits of the preemption issue; (2) in failing to sustain the demurrers and grant the summary judgment motion of the regulated utilities; and (3) in failing to overrule the demurrers and deny the judgment on the pleadings of the nonregulated water providers and industrial defendants. It further upheld the Ventura County Superior Court's rulings in the Santamaria action in all respects.

We granted the petitions for review filed by the Santamaria plaintiffs, and by the nonregulated water providers and the industrial defendants in all four lawsuits.[5]

## DISCUSSION

" 'The [PUC] is a state agency of constitutional origin with far-reaching duties, functions and powers. (Cal. Const., art. XII, §§ 1-6.) The Constitution confers broad authority on the [PUC] to regulate utilities, including the power to fix rates, establish rules, hold various types of hearings, award reparation, and establish its own procedures. (*Id.*, §§ 2, 4, 6.)' " (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 914-915 [55 Cal.Rptr.2d 724, 920 P.2d 669] (*Covalt*).) In addition to those powers expressly conferred on the PUC, the California Constitution confers broad

---

[5]The Adler, Boswell, and Celi plaintiffs did not seek review.

authority on the Legislature to regulate public utilities and to delegate regulatory functions to the PUC. (Cal. Const., art. XII, §§ 3, 5.)

Consistent with these constitutional mandates, the Legislature has granted the PUC comprehensive jurisdiction to regulate the operation and safety of public utilities. (§§ 701, 761, 768, 770, subd. (a).) Section 701 authorizes the PUC to "supervise and regulate every public utility in the State and [to] do all things . . . which are necessary and convenient in the exercise of such power and jurisdiction." Section 702 commands every public utility to obey the PUC's orders, decisions, directions, or rules "in any way relating to or affecting its business as a public utility . . . ."

The California Constitution also confers plenary power on the Legislature to "establish the manner and scope of review of commission action in a court of record . . . ." (Cal. Const., art. XII, § 5.) In the exercise of that power, the Legislature has chosen to limit the jurisdiction of judicial review of the PUC's decisions. Section 1759, subdivision (a), provides that: "No court of this state, except the Supreme Court and the court of appeal, to the extent specified in this article, shall have jurisdiction to review, reverse, correct, or annul any order or decision of the commission or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the commission in the performance of its official duties, as provided by law and the rules of court."

■ Defendants, which include the regulated utilities; nonregulated water providers, and the industrial defendants, contend that section 1759 precludes plaintiffs' actions in superior court. In response, plaintiffs argue that section 1759 is inapplicable and that section 2106 permits their lawsuit against the regulated utilities. Section 2106 provides in pertinent part: "Any public utility which does, causes to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do any act, matter, or thing required to be done, either by the Constitution, or any law of this State, or any other order or decision of the commission, shall be liable to the persons or corporations affected thereby for all loss, damages, or injury caused thereby or resulting therefrom. . . . An action to recover for such loss, damage, or injury may be brought in any court of competent jurisdiction by any corporation or person."

In *Waters v. Pacific Telephone Co.* (1974) 12 Cal.3d 1 [114 Cal.Rptr. 753, 523 P.2d 1161] (*Waters*), we concluded that "in order to resolve the potential conflict between sections 1759 and 2106, the latter section must be construed as limited to those situations in which an award of damages would not hinder or frustrate the [PUC's] declared supervisory and regulatory policies." (*Id.* at p. 4.) There, the plaintiffs sued a telephone company in superior

court for failing to furnish adequate telephone service. We noted that the PUC, in approving rates charged, had relied on a policy it adopted of limiting liability of telephone utilities for acts of ordinary negligence to a specified credit allowance as set forth in approved tariff schedules. We held that section 1759 barred the superior court action because damage awards would conflict with the PUC's policies and interfere with its regulation of telephone utilities.

We again addressed the relationship between sections 1759 and 2106 in *Covalt, supra,* 13 Cal.4th 893, in which the issue was whether section 1759 barred a superior court action for nuisance and property damage allegedly caused by electric and magnetic fields (EMF's) from power lines owned and operated by a public utility. (*Covalt, supra,* at p. 903.) In applying section 1759, we used a three-part test: (1) whether the PUC had the authority to adopt a regulatory policy on whether EMF's are a public health risk and what steps the utilities should take, if any, to minimize the risk; (2) whether the PUC had exercised that authority; and (3) whether the superior court action would hinder or interfere with the PUC's exercise of regulatory authority with respect to EMF's. (*Covalt, supra,* at pp. 923, 926, 935.) We found preemption after answering all three questions in the affirmative.

Plaintiffs argue that *Covalt's* three prongs have not been met in this case. They argue that the PUC lacks the authority to regulate water quality, that it has never exercised that authority until its recent investigation on water quality, and that the complaints in the lawsuits would not interfere with the PUC's exercise of regulatory authority. We reject plaintiffs' first two arguments, but agree that some of the damage claims would not interfere with any ongoing PUC regulatory program.

A. *Section 1759 Bars the Injunctive Relief Claims and Some of the Damage Claims Against the Regulated Utilities*

1. *Background Information*

Since the enactment of the Public Utilities Act in 1911 (Stats. 1911, Ex. Sess. 1911, ch. 14, § 1, p. 18), the PUC has regulated public utility water companies. (See *In re Application Southern California Mountain W. Co.* (1912) 1 Cal.P.U.C. 841.) From 1912 to 1956, the PUC exercised its public health and safety authority over public utility water service on a case-by-case basis; it examined water quality issues and, where necessary, required water utilities to take specific actions to ensure safe drinking water and authorized rate recovery for the associated costs. (Cal.P.U.C. Dec. No. 99-06-054, *supra,* 1999 Cal.P.U.C. Lexis 312 at p. 30, fn. 18, 38.) On its own motion in 1955, the PUC initiated a comprehensive investigation to

establish "uniform service standards and service rules applicable to all privately-owned, public utility water companies in the State of California." (*Re Adoption of Service Standards and Service Rules for Water Utilities* (1956) 55 Cal.P.U.C. 56.) The proceeding resulted in the adoption of general order No. 103, which established uniform standards of water quality service for regulated utilities, including specific requirements for the source of water, operation of the water supply system, and water testing requirements. (*Ibid.*)

General order No. 103, which has been amended during the intervening years, presently provides that "[a]ny utility serving water for human consumption or for domestic uses shall provide water that is wholesome, potable, in no way harmful or dangerous to health and, insofar as practicable, free from objectionable odors, taste, color, and turbidity." (Cited by Cal.P.U.C. Dec. No. 99-06-054, *supra*, 1999 Cal.P.U.C. Lexis 312 at pp. 39-40.) It requires each utility to comply with the water quality standards of the DHS and the United States Environmental Protection Agency (EPA) and states that compliance with DHS regulations constitutes compliance with the PUC's rules, " 'except as otherwise ordered by the commission.' "[6] (*Id.,* 1999 Cal.P.U.C. Lexis 312 at p. 40.)

Until 1974, the PUC's authority to determine the appropriate standards for the water quality and service provided by public utility water systems was limited only by the statutory requirement that such standards be "just and reasonable" and "adequate and serviceable." (§ 770; Cal.P.U.C. Dec. No. 99-06-054, *supra*, 1999 Cal.P.U.C. Lexis 312 at p. 44.) However, in 1974, Congress enacted the federal Safe Drinking Water Act (federal SDWA) (42 U.S.C. § 300f et seq.), which prohibits states from enacting drinking water laws less stringent than those established by the EPA. (42 U.S.C. § 300g.) "Congress occupied the field of public drinking water regulation with its enactment of the [federal] SDWA. 'The purpose of the [federal SDWA] is to assure that water supply systems serving the public meet minimum *national standards* for protection of public health.' [Citation.] With minor exceptions, the SDWA applies 'to each public water system in each State.' 42 U.S.C. § 300g . . . . [A]lthough the primary responsibility for enforcement remains with the States, the Administrator is empowered to enforce State compliance. *Id.* §§ 300g-2, 300g-3." (*Mattoon v. City of Pittsfield* (1st Cir. 1992) 980 F.2d 1, 4.) Accordingly, the federal SDWA grants states primary authority to implement the provisions of the federal standards and allows states to set stricter water quality standards than those of the federal government. (42 U.S.C. § 300g-2(a); see 42 U.S.C. § 300g-1(b).) Although the

---

[6]Although general order No. 103 has been amended during the intervening years, the policy of requiring wholesome, potable, and healthful water and of adopting the DHS health standards has remained the same since its inception. (Cal.P.U.C. Dec. No. 99-06-054, *supra*, 1999 Cal.P.U.C. Lexis 312 at pp. 39-40.)

federal SDWA preempts federal common law nuisance actions (*Mattoon v. City of Pittsfield, supra*, 980 F.2d at p. 4), state common law is not preempted. (*United States v. Hooker Chemical & Plastics Corp.* (W.D.N.Y. 1985) 607 F.Supp. 1052, 1055, fn. 3.)

In 1976, the Legislature enacted the state Safe Drinking Water Act (state SDWA). (Stats. 1976, ch. 1087, § 2.5, pp. 4918-4929, adding Health & Saf. Code, former § 4010 et seq., currently codified at Health & Saf. Code, § 116275 et seq.) When the Legislature enacted the state SDWA, it assumed the primary authority to administer the federal act. The state SDWA, administered by the DHS, establishes standards at least as stringent as the federal SDWA and is intended to be "more protective of public health" than the minimum federal standards. (Health & Saf. Code, §§ 116270, subd. (f), 116325.) The Court of Appeal below described the state SDWA:

"*Paredes v. County of Fresno* (1988) 203 Cal.App.3d 1 [249 Cal.Rptr. 593] (*Paredes*) described in some detail the California SDWA, in addressing the regulation of water contaminated with DBCP, a toxic substance not specifically in issue in our case. 'The California Legislature has declared water delivered by public water systems in this state should be at all times pure, wholesome, and potable. It has adopted procedures to be followed in an effort to accomplish this objective in [Health and Safety Code] sections 4010.1 through 4039.5. ([Health & Saf. Code,] § 4010.) These sections [which have since been amended and moved to Health and Safety Code sections 116275 through 117130 (Stats. 1995, ch. 415, § 6)] describe the permit process for the operation of a public water system ([Health & Saf. Code,] art. 1, §§ 4011-4022), the regulation of the quality of the water supply of a public water system ([*id.*,] art. 2, §§ 4023.5-4030.7), violations ([*id.*,] art. 3, § 4031), remedies ([*id.*,] art. 4, §§ 4032-4036.5), judicial review ([*id.*,] art. 4.5, § 4037), and applicable crimes and penalties ([*id.*,] art. 5, §§ 4037.5-4039.5).

" 'Any person who operates a public water system must: comply with primary and secondary drinking water standards; ensure the system will not be subject to backflow under normal operating conditions; and provide a reliable and adequate supply of pure, wholesome, healthful, and potable water. ([Health & Saf. Code,] § 4017.) Primary drinking water standards specify maximum levels of contaminants, which, in the judgment of the DHS director, may have an adverse effect on the health of persons. ([*Id.*,] § 4010.1, subd. (b)(1).) Secondary drinking water standards specify maximum contaminant levels which, in the judgment of the director, are necessary to protect public welfare. Secondary drinking water standards may apply to any drinking water contaminant which may: (1) adversely affect the odor or appearance of such water and cause a substantial number of persons

served by the public water system to discontinue its use; or (2) otherwise adversely affect the public welfare. (*[Id.,]* § 4010.1, subd. (b)(2).) Maximum contaminant level means the maximum permissible level of a contaminant in water. (*[Id.,]* § 4010.1, subd. (c).)

" 'The regulations establishing primary and secondary drinking water standards for public water systems are contained in title 22 of California Code of Regulations, section 64401 et seq. (Cal. Code Regs., tit. 22, § 64401, subd. (a).) Those drinking water standards are based upon the national interim primary and secondary drinking water regulations contained in the Code of Federal Regulations.' (*Paredes, supra,* 203 Cal.App.3d at p. 5, fn. omitted.)

"In California, when a contaminant is discovered for which there is no primary or secondary standard, the DHS develops an 'action level' for it. In the early 1980's, the Legislature adopted a program for detecting and monitoring organic chemical contaminants for which mandatory levels did not exist. Legislation authorized the DHS to require monitoring for these unregulated chemicals and notification of the public when action levels were exceeded. DHS implemented the legislation by adopting guidelines for responding when action levels were exceeded. (*Paredes, supra,* 203 Cal.App.3d at pp. 6-7.)

"Although the Legislature moved the Safe Drinking Water Act to Health and Safety Code section 116275 et seq. during a statutory reorganization in 1995 (Stats. 1995, ch. 415, § 6 . . .) and amended it in subsequent years (Stats. 1996, ch. 755, §§ 1-12 . . . ; Stats. 1997, ch. 734, §§ 1-15 . . .), the general regulatory scheme described in *Paredes* has remained intact." (Fn. omitted.)

> 2. *The PUC Has Authority to Enforce Water Quality and Limited Authority to Adopt Water Quality Standards for Regulated Utilities*

Plaintiffs argue that the DHS and the EPA have exclusive authority to set standards and enforce laws related to the state and federal SDWA's and that the regulation of water quality is the function of the DHS, not the PUC. Plaintiffs are correct that the Legislature has vested in DHS primary responsibility for the administration of the safe drinking water laws. (Health & Saf. Code, § 116325.) However, they are incorrect in asserting that the PUC has no authority to set and enforce drinking water standards when regulating water providers. The Legislature has vested the PUC with general and specific powers to ensure the health, safety, and availability of the public's drinking water.

Article X, section 5 of the California Constitution states: "The use of all water now appropriated, or that may hereafter be appropriated, for sale,

rental, or distribution, is hereby declared to be a public use, and subject to the regulation and control of the State, in the manner to be prescribed by law." Article XII, section 3 of the California Constitution provides that "Private corporations and persons that own, operate, control, or manage a line, plant, or system for . . . the production, generation, transmission, or furnishing of . . . water . . . directly or indirectly to or for the public . . . are public utilities subject to control by the Legislature." Such public utilities are thereby subject to regulation by the PUC. (Cal. Const, art. XII, § 5; Pub. Util. Code, §§ 701, 761, 770, 2701.) In regulating utilities, the PUC is authorized to "do all things . . . which are necessary and convenient in the exercise of [its] power and jurisdiction" (§ 701) and required to ensure that the service and equipment of any public utility protect the public health and safety. (§§ 451,[7] 768.[8]) Drinking water quality affects health and safety and is therefore within the PUC's regulatory jurisdiction over public utility water companies to ensure that public health and safety are protected. (§§ 451, 739.8, subd. (a), 761, 768, 770, subd. (b); see *Citizens Utilities Co. v. Superior Court* (1976) 56 Cal.App.3d 399, 408 [128 Cal.Rptr. 582].)

The PUC's most obvious regulatory authority includes the regulation of rates: "Access to an adequate supply of healthful water is a basic necessity of human life, and shall be made available to all residents of California at an affordable cost." (§ 739.8, subd. (a).)

In addition, section 770 addresses water quality regulation and provides in pertinent part: "The commission may after hearing: [¶] . . . [¶] (b) Ascertain and fix adequate and serviceable standards for the measurement of . . . quality . . . or other condition pertaining to the supply of the product, commodity, or service furnished or rendered by any such public utility. No standard of the commission applicable to any water corporation shall be inconsistent with the regulations and standards of the State Department of Health pursuant to Chapter 4 (commencing with Section 116275) of Part 12 of Division 104 of the Health and Safety Code."

In 1974, when Congress first passed the federal SDWA, the Legislature amended section 770, subdivision (b), to include the following proscription:

---

[7]Section 451 provides in pertinent part: "Every public utility shall furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities . . . as are necessary to promote the safety, health, comfort, and convenience of its patrons . . . and the public."

[8]Section 768 provides in pertinent part: "The commission may, after a hearing, require every public utility to construct, maintain, and operate its line, plant, system, equipment, apparatus, tracks, and premises in a manner so as to promote and safeguard the health and safety of its . . . customers, and the public. . . . The commission may establish uniform or other standards of construction and equipment, and require the performance of any other act which the health or safety of its . . . customers, or the public may demand. . . ."

"No standard of the commission relating to water quality, however, shall be applicable to any water corporation which is required to comply with the regulations and standards of the State Department of Health pursuant to Chapter 7 (commencing with Section 4010) of Part 1 of Division 5 of the Health and Safety Code." (Stats. 1974, ch. 229, § 1, p. 434.) In 1976, the Legislature again amended subdivision (b) to eliminate the proscription and instead to provide that: "No standard of the commission applicable to any water corporation shall be *inconsistent* with the regulations and standards of the State Department of Health pursuant to Chapter 7 (commencing with Section 4010) of Part 1 of Division 5 of the Health and Safety Code." (Stats. 1976, ch. 1087, § 4, p. 4929, italics added; see Stats. 1976, ch. 1037, § 3, p. 4648.) Thus, the present statute gives the PUC authority to develop and apply standards for the quality of the product or service provided by regulated utilities as long as they are not "inconsistent" with the regulations and standards of DHS.[9]

Nevertheless, whether the PUC has independent authority to set water quality standards is not dispositive. The PUC has constitutional and statutory authority and responsibilities to ensure that the regulated utilities provide service (e.g., water) that protects the public health and safety. (§§ 701, 451, 768.) While the water quality standards may be the product of DHS study and expertise, they are the PUC standards as well. The Legislature, by mandating that the PUC standards cannot be "inconsistent" with DHS water quality standards, has established that the DHS safety standards are the minimum standards for the PUC to use in performing its regulatory function of ensuring compliance with safety standards.

Since 1956, the PUC's supervisory policy, as embodied in general order No. 103, has required public utilities to comply with the water quality standards of the relevant state and federal health agencies, " 'except as otherwise ordered by the Commission.' " (Cal.P.U.C. Dec. No. 99-06-054, *supra*, 1999 Cal.P.U.C. Lexis 312 at p. 40.) In implementing that policy, the PUC can require prescribed water quality corrective actions, both in rate and complaint cases affecting particular utilities and in industrywide investigations such as the 1998-2000 investigation into water quality. (Pub. Util.

---

[9]In its final opinion on water quality, the PUC ordered a subsequent investigation and/or rulemaking proceeding, which will consider (1) whether DHS's action levels, which DHS categorizes as nonmandatory and nonenforceable levels, should be mandatory for regulated utilities, and (2) whether the utilities complied with general order No. 103 standards in existence before the adoption by DHS of maximum contaminant levels and action levels. (Cal.P.U.C. Dec. No. 00-11-014, *supra*, 2000 Cal.P.U.C. Lexis 722 at pp. 20, 65, 73-74.) A PUC rule requiring regulated utilities to meet DHS action levels would not be inconsistent with mandatory DHS water quality standards. Indeed, during the investigation, the DHS suggested that the PUC require utility compliance with the DHS action levels and customer notification when DHS action levels are exceeded. (Cal.P.U.C. Dec. No. 00-11-014, *supra*, 2000 Cal.P.U.C. Lexis 722 at p. 37.)

Code, §§ 1701-1702, 2101; Health & Saf. Code, § 116465; *Ford v. Pacific Gas & Electric Co.* (1997) 60 Cal.App.4th 696, 707 [70 Cal.Rptr.2d 359]; see also *Consumers Lobby Against Monopolies v. Public Utilities Com.* (1979) 25 Cal.3d 891, 907 [160 Cal.Rptr. 124, 603 P.2d 41].) It can enforce its orders and decisions by suit (Pub. Util. Code, § 2101), by mandamus or injunction (*id.*, §§ 2102-2103), by actions to recover penalties (*id.*, §§ 2104, 2107), and by contempt proceedings (*id.*, § 2113). Thus, the PUC has the authority to adopt a policy on water quality and to take the appropriate actions, if any, to ensure water safety.

### 3. The PUC Has Undertaken the Ongoing Regulation of Drinking Water Quality

As stated above, the PUC exercised its public health and safety authority over public utility water service on a case-by-case basis from 1912 to 1956 and adopted general order No. 103 in 1956. The PUC and DHS confirmed their partnership on water quality issues in a joint memorandum of understanding in 1987, which was updated in 1996. (Cal.P.U.C. Dec. No. 99-06-054, *supra*, 1999 Cal.P.U.C. Lexis 312 at p. 28, fn. 16.) It acknowledged "their joint goal to ensure that California water companies regulated by PUC are economically maintaining safe and reliable water supplies." (*Id.*, 1999 Cal.P.U.C. Lexis 312 at p. 111.) The memorandum defined DHS's responsibility for identifying contaminants and the improvements necessary to provide safe water supplies, and for initiating enforcement actions under the state SDWA; the PUC retained responsibility for approving rate changes to finance improvements, for informing customers, and for monitoring non-SDWA water quality requirements. The two agencies agreed to work together and share information. (*Id.*, 1999 Cal.P.U.C. Lexis 312 at pp. 104-120.)

In exercising its regulatory authority over water quality, the PUC has decided what constitutes adequate compliance with applicable water quality standards, whether any increased water treatment is justified in light of its impact on ratepayers, and what marginal increases in safety may be gained. (See, e.g., *California-American Water Co.* (1986) 20 Cal.P.U.C.2d 596 [PUC refused to authorize water utility to install water quality treatment facility, and instead ordered it to evaluate other, less costly alternatives]; *San Gabriel Valley Water Co.* (1998) Cal.P.U.C. Dec. No. 98-08-034 [1998 Cal.P.U.C. Lexis 575] [PUC approved water utility's request for additional water quality treatment facilities, rejecting ratepayers' argument that new treatment plant should be allowed only when prescribed maximum contaminant levels exceed DHS standards].)

The Court of Appeal below noted other actions by the PUC with respect to the quality of drinking water provided by public utilities: "In 1983, it

adopted a service improvement policy, requiring water utilities to identify the most cost-effective alternatives for dealing with water service problems, including contamination. In 1986, it issued guidelines for water quality improvement projects. In 1990, it issued a risk and return report, addressing the development of drinking water quality standards, new testing procedures, and application of drinking water standards to large and small water utilities. In 1994, it issued a decision concluding that drinking water quality standards would require investment of $50 million to $200 million in water treatment facilities over the next several years. In 1996, it authorized water utilities to establish accounts to record and recover expenses incurred in complying with EPA drinking water regulations and paying DHS testing and regulatory fees. In addition, the commission issued a series of individual rate decisions analyzing health standards and individual communities' abilities to absorb the costs of varying treatment levels."

The PUC itself has stated: "[T]he Commission's cost setting and regulating role is inextricably bound to the quality of water provided by the regulated utilities." (Cal.P.U.C. Dec. No. 99-09-073, *supra*, 1999 Cal.P.U.C. Lexis 594 at p. 9.) "Most often, authorization for corrective or preventative water quality measures occurs in a rate case." (Cal.P.U.C. Dec. No. 99-06-054, *supra*, 1999 Cal.P.U.C. Lexis 312 at p. 31.) In reviewing a water utility's rate increase application, the PUC must review the reasonableness of the utility's proposed investment, its compliance with health department regulations, its implementation of previous PUC decisions affecting water quality, and its compliance with general order No. 103. (Cal.P.U.C. Dec. No. 99-06-054, *supra*, 1999 Cal.P.U.C. Lexis 312 at pp. 31-32.) Thus, in setting rates at affordable levels, the PUC must balance the quality and cost of water services.

In its final opinion, the PUC explained the basis for its concurrent jurisdiction with the DHS over water quality safety: "A jurisdictional structure that preserves the authority of both DHS and the [PUC] over the quality of water provided to residents and businesses by private water companies is consistent with the original intent of the 1911 Act giving the [PUC] authority over water issues. It remains crucial to the effective regulation of public utilities. The expertise of the [PUC], however, has always centered around the creation of financial and regulatory incentives that foster and support socially desired behavior from firms that operate in a marketplace characterized by limited competition. Thus, it is clearly reasonable that the Legislature continue to marshal the expertise of the [PUC] as well as the health-science expertise of DHS to support a public interest as critical as the quality of drinking water." (Cal.P.U.C. Dec. No. 00-11-014, *supra*, 2000 Cal.P.U.C. Lexis 722 at pp. 17-18.) As shown by the DHS's participation in the PUC's recent water quality investigation, the PUC and the DHS continue to work together to ensure that public water utilities provide safe and healthy water.

Plaintiffs argue that their lawsuits should not be preempted because the PUC has deferred to the DHS to set and enforce water quality standards, has no expertise in water quality issues, and has focused on ratemaking. Our decision in *Covalt* leads us to a different estimation of PUC's regulatory involvement. In *Covalt*, notwithstanding the PUC's deference to the DHS's expertise on health issues, we concluded that the PUC had preemptively exercised its authority to adopt a policy on powerline EMF's. (*Covalt, supra,* 13 Cal.4th at pp. 926-934, 946-947.)

The circumstances in that case involved a PUC investigation into the health effects of EMF emissions. The PUC had issued an interim opinion and order that summarized what had occurred during the investigation up to that point and the recommendations for further studies. In the interim opinion and order, the PUC recognized the DHS's expertise and concurrent jurisdiction in establishing EMF policy. (*Re Potential Health Effects of Electric and Magnetic Fields of Utility Facilities* (1993) 52 Cal.P.U.C.2d 1, 8, 14-15.) We noted that, for the investigation, the PUC had asked DHS to assess the scientific evidence concerning the potential dangers of EMF's and had relied on the DHS witness in developing a policy on the potential health risks of EMF's from utility facilities. (*Id.* at p. 8; *Covalt, supra,* 13 Cal.4th at p. 930.) In determining the need for further research and education programs, the PUC found that the DHS was the "appropriate agency" "to inform [it] as to the type of public health risk, if any, connected to EMF exposure and utility property or operations" and "to define the research needed to determine whether there is a clear cause and effect relationship between EMF from utility property and public health." (*Re Potential Health Effects of Electric and Magnetic Fields of Utility Facilities, supra,* 52 Cal.P.U.C.2d at pp. 27-28.) Accordingly, DHS was designated as the EMF education and research program manager. (*Id.* at pp. 15, 21, 30.) Its duties included implementing and coordinating statewide research and education programs, defining the needed research, developing educational information for distribution to utility customers, monitoring the quality of research and education, and providing an annual research report to PUC. (*Id.* at pp. 16, 22-23, 26, 28-30; see also *Covalt, supra,* 13 Cal.4th at pp. 932-933.)

It is true that the PUC's primary involvement with water quality has been in the context of ratemaking, determining which water quality improvements to authorize or mandate and their costs, and the necessary rate increases. However, in making those decisions, the PUC had to consider, as it did in *Covalt*, the health and safety of the service provided by the regulated utilities. Accordingly, we find that the PUC has exercised and continues to exercise its jurisdiction to regulate drinking water quality.

### 4. *Some of Plaintiffs' Actions Would Interfere with the PUC's General Supervisory and Regulatory Policies, While Others Would Not*

Under the third prong of *Covalt*, superior court lawsuits against public utilities are barred by section 1759 "not only when an award of damages would directly contravene a specific order or decision of the commission, i.e., when it would 'reverse, correct, or annul' that order or decision, but also when an award of damages would simply have the effect of undermining a general supervisory or regulatory policy of the commission, i.e., when it would 'hinder' or 'frustrate' or 'interfere with' or 'obstruct' that policy." (*Covalt, supra,* 13 Cal.4th at p. 918.) " 'The PUC has exclusive jurisdiction over the regulation and control of utilities, and once it has assumed jurisdiction, it cannot be hampered, interfered with, or second-guessed by a concurrent superior court action addressing the same issue.' " (*Id.* at p. 918, fn. 20, italics omitted; see, e.g., *Waters, supra,* 12 Cal.3d at pp. 10-12 [damage action for negligence in providing telephone service conflicted with PUC-approved tariff limiting telephone customer to credit allowance for improper service].) In short, an award of damages is barred by section 1759 if it would be contrary to a policy adopted by the PUC and would interfere with its regulation of public utilities. (*Waters, supra,* 12 Cal.3d at pp. 4, 11.)

On the other hand, superior courts are not precluded from acting in aid of, rather than in derogation of, the PUC's jurisdiction. (*Vila v. Tahoe Southside Water Utility* (1965) 233 Cal.App.2d 469 [43 Cal.Rptr. 654].) Thus, a court has jurisdiction to enforce a water utility's legal obligation to comply with PUC standards and policies and to award damages for violations. (See, e.g., *id.* at pp. 479-480 [office building owner permitted to seek damages for water utility's failure to provide single water service connection to multiple tenant building as required by unambiguous tariff approved by the PUC].)

"When the bar raised against a private damages action has been a ruling of the commission on a single matter such as its approval of a tariff or a merger, the courts have tended to hold that the action would not 'hinder' a 'policy' of the commission within the meaning of *Waters* and hence may proceed. But when the relief sought would have interfered with a broad and continuing supervisory or regulatory program of the commission, the courts have found such a hindrance and barred the action under section 1759." (*Covalt, supra,* 13 Cal.4th at pp. 918-919.)

#### a. *Damages*

Plaintiffs alleged water contamination without regard to whether the water met drinking water standards (e.g., injury from "the toxic contamination of drinking water, with chemicals, including, but not limited to," three

chemicals with established maximum contaminant levels). They also alleged water contamination that exceeded and violated federal and state drinking water standards. In essence, plaintiffs challenged both the adequacy of the standards and compliance with those standards.

The first challenge, to the adequacy of the standards, is barred. An award of damages on the theory that the public utilities provided unhealthy water, even if that water actually met DHS and PUC standards, would interfere with a "broad and continuing supervisory or regulatory program" of the PUC. (*Covalt, supra,* 13 Cal.4th at p. 919.) In order to perform its regulatory functions, such as ratemaking, the PUC must have certain water quality benchmarks. For example, in determining whether to approve a rate increase, the PUC must consider whether a regulated water utility's existing revenues are adequate to finance any water treatment facility that may be needed. Whether a treatment facility is needed, and, if so, the expense thereof, cannot be determined except with reference to an applicable water quality standard. General order No. 103, promulgated by the PUC in 1956, formally adopted the DHS water quality standards as its own. Thus, the DHS standards serve as those benchmarks. A superior court determination of the inadequacy of a DHS water quality standard applied by the PUC would not only call DHS regulation into question, it would also undermine the propriety of a PUC ratemaking determination. Moreover, the DHS standards have been used by the PUC in its regulatory proceedings for many years as an integral part of its broad and continuing program or policy of regulating water utilities. As part of that regulatory program, the PUC has provided a safe harbor for public utilities if they comply with the DHS standards. An award of damages on the theory that the public utilities provided unhealthy water, even if the water met DHS standards, "would plainly undermine the commission's policy by holding the utility liable for not doing what the commission has repeatedly determined that it and all similarly situated utilities were not required to do." (*Covalt, supra,* 13 Cal.4th at p. 950.) Thus, such damage actions are barred.

On the other hand, damage claims based on the theory that the water failed to meet federal and state drinking water standards are not preempted by section 1759. A jury award based on a finding that a public water utility violated DHS standards would not interfere with the PUC regulatory policy requiring water utility compliance with those standards. We recognize that in PUC Decision No. 00-11-014, the final opinion on water quality, the PUC made a retrospective finding that the regulated utilities investigated, including the regulated defendants in this case, had substantially complied with DHS drinking water standards for the past 25 years. However, that factual finding was not part of an identifiable "broad and continuing supervisory or regulatory program of the commission" (*Covalt, supra,* 13 Cal.4th at p. 919),

related to such routine PUC proceedings as ratemaking (see *Citizens Utilities Co. v. Superior Court, supra,* 56 Cal.App.3d 399) or approval of water quality treatment facilities. Nor was that finding part of a broad and continuing program to regulate public utility water quality, a point the PUC itself implicitly recognized during its investigation when it stated: "This investigation is an inquiry into the safety of the drinking water supplied by Commission regulated water utilities. This is an information gathering process. This is not a rulemaking proceeding, although the information gathered here may result in our instituting a rulemaking proceeding to develop new operating practices for regulated water utilities to better ensure the health and safety of water service. This is also not an enforcement proceeding, although the information accumulated here regarding the compliance of regulated water utilities with the safe drinking water laws may result in our instituting formal enforcement investigations of individual water utilities where justified." (Cal.P.U.C. Dec. No. 99-06-054, *supra,* 1999 Cal.P.U.C. Lexis 312 at pp. 48-49, fn. omitted.)

Although a PUC factual finding of past compliance or noncompliance may be part of a future remedial program, a lawsuit for damages based on past violations of water quality standards would not interfere with such a prospective regulatory program. As noted, the PUC can redress violations of the law or its orders by suit (§ 2101), by mandamus or injunction (§§ 2102-2103), by actions to recover penalties (§§ 2104, 2107), and by contempt proceedings (§ 2113), but these remedies are essentially prospective in nature. They are designed to stop the utilities from engaging in current and ongoing violations and do not redress injuries for past wrongs. (See *Vila v. Tahoe Southside Water Utility, supra,* 233 Cal.App.2d at p. 479 [the PUC has no authority to award damages].) Here, plaintiffs alleged injuries caused by water that failed to meet state and federal drinking water standards "for many years." Because the PUC cannot provide for such relief for past violations, those damage actions would not interfere with the PUC in implementing its supervisory and regulatory policies to prevent future harm.

The regulated and nonregulated defendants argue that an award of damages against the regulated utility defendants for providing harmful or unhealthy water, would directly "contravene" a specific order or decision of the PUC, as stated in *Covalt.* (*Covalt, supra,* 13 Cal.4th at p. 918.) However, the *Covalt* language regarding the contravention of an order was simply a reference to the statutory language in subdivision (a) of section 1759 that "No court of this state, except the Supreme Court and the court of appeal . . . shall have jurisdiction to review, reverse, correct, or annul any order or decision of the commission . . . ." (*Covalt, supra,* at p. 918.) Although a jury award supported by a finding that a public water utility violated DHS and PUC standards would be contrary to a single PUC decision, it would not

hinder or frustrate the PUC's declared supervisory and regulatory policies, for the reasons discussed earlier. Under the provisions of section 1759, it would also not constitute a direct review, reversal, correction, or annulment of the decision itself. Accordingly, such a jury verdict would not be barred by the statute.

### b. *Injunctive Relief*

In addition to alleging damages, the Santamaria plaintiffs asked for injunctive relief for current water quality violations. However, a court injunction issued after a jury finding of DHS standards violations would "interfere with the commission in the performance of its official duties . . . ." (§ 1759.) As part of its water quality investigation, the PUC determined, not only whether the regulated utilities had complied with drinking water standards for the past 25 years, but also whether they were currently complying with existing water quality regulation. (Cal.P.U.C. Dec. No. 00-11-014, *supra*, 2000 Cal.P.U.C. Lexis 722 at pp. 5, 105-108.) In PUC Decision No. 00-11-014, the final opinion on water quality, the PUC found that the regulated utility defendants in this case were in compliance with DHS regulations and that "no further inquiry or evidentiary hearings" were required regarding compliance. (Cal.P.U.C. Dec. No. 00-11-014, *supra*, 2000 Cal.P.U.C. Lexis 722 at p. 6.) Based on that factual finding, the PUC impliedly determined it need not take any remedial action against those regulated utilities. A court injunction, predicated on a contrary finding of utility noncompliance, would clearly conflict with the PUC's decision and interfere with its regulatory functions in determining the need to establish prospective remedial programs. In contrast, even if a jury award of damages on a finding of past violations would conflict with the PUC's factual finding of no past violations, the jurisdictional role of the PUC would not be affected. Under the regulatory framework at issue, here, the PUC's role is to ensure present and future compliance.[10]

---

[10]Plaintiffs claim that PUC jurisdiction cannot preempt the private right of actions established by Proposition 65 (the Safe Drinking Water and Toxic Enforcement Act of 1986; Health & Saf. Code, § 25249.5 et seq.) or the state SDWA, and that citizen enforcement is an essential part of the regulatory scheme. However, plaintiffs do not qualify as citizen enforcers of water quality standards under Proposition 65. Private enforcement under Proposition 65 supplements agency enforcement only if the Attorney General or other appropriate prosecutor has failed to act diligently against an alleged violator and notice of the alleged violation has been given to the appropriate prosecutor. (Health & Saf. Code, § 25249.7; see also 42 U.S.C. § 300j-8(b) [similar procedural requirements required for federal citizen enforcement proceedings].) The private enforcer may not seek damages, but may only obtain injunctive relief and statutory penalties. (Health & Saf. Code, § 25249.7, subds. (a), (b), (d).) Apart from failing to meet the procedural prerequisites, plaintiffs' damage claims clearly disqualify them as citizen enforcers. Moreover, preemption of private injunctive relief claims would not affect the enforcement provisions of either the state SDWA or Proposition 65. The state SDWA can

In summary, plaintiffs' damage claims, alleging water contamination irrespective of whether drinking water standards were met, and their injunctive relief claims, are preempted by section 1759.[11] On the other hand, plaintiffs' damage claims alleging water contamination that violated and exceeded federal and state drinking water standards are authorized under section 2106.[12]

**B.** *Section 1759 Does Not Bar the Superior Court Actions Against Defendants Not Regulated by the PUC*

Advocating an "issue oriented analysis," the nonregulated water providers and the industrial defendants claim that, as with the regulated utilities, the superior court actions against them are preempted. Their claim is based on the following arguments: (1) the statutory language of section 1759 does not make any distinction between utility and nonutility parties to a lawsuit; (2) our opinion in *Covalt* affirms that preemption of court proceedings applies to issues or subject matter before the PUC, not just to actions against regulated companies, if "an award of damages would simply have the effect of undermining a general supervisory or regulatory policy of the commission"; and (3) the issues in the superior court actions and the PUC investigation involve the safety of the very same water supply. Thus, it is argued, a jury

be enforced by the DHS (Health & Saf. Code, §§ 116325, 116500, 116660) or the Attorney General (Code Civ. Proc., § 803; *Citizen Utilities Co. v. Superior Court, supra,* 56 Cal.App.3d at pp. 403-407), but there is no mandate for citizen enforcement actions under the state SDWA. Also, most, if not all, public water utilities are exempted from the coverage of Proposition 65. (Health & Saf. Code, §§ 25249.5, 25249.6, 25249.11, subd. (b), 116275, subd. (h).)

[11]The regulated utilites argue that, because plaintiffs who intervened in the PUC's water quality investigation failed to appeal the PUC's jurisdictional finding, they are collaterally estopped from challenging its conclusion that it has jurisdiction over the quality of water supplied by the regulated utilities. The PUC found that it possesses authority and has exercised its authority to regulate the quality of the service and the drinking water that the water utilities provide. The PUC expressly refused to decide the third *Covalt* prong: whether the lawsuits in this case interfered with its water quality investigation. (Cal.P.U.C. Dec. No. 99-06-054, *supra,* 1999 Cal.P.U.C. Lexis 312 at p. 65, fn. 37.) Because we agree that the PUC has jurisdiction and has exercised its jurisdiction over the water quality supplied by the regulated utilities, we need not address the collateral estoppel claim.

[12]Plaintiffs request that we take judicial notice of what appear to be Internet articles found on a DHS Web site. These articles indicate, as of January 3, 2001, that chromium VI is an unregulated chemical that required monitoring. Plaintiffs seek judicial notice of those articles as proof that their allegations raise no conflict with PUC policy because neither the PUC nor DHS has set water quality standards that govern chromium VI, an "unregulated chemical." The regulated utilities and the industrial defendants oppose the motion for judicial notice. We deny plaintiffs' request. As stated by the industrial defendants, the articles contain unauthenticated statements with no indication of author, custodian, date of creation, purpose, reliability, or veracity. Also, the articles do not appear to be relevant because the complaint did not specifically allege plaintiffs had been exposed to chromium VI and no evidence regarding this chemical had been presented to the trial court.

award of damages against a nonregulated defendant, based on a determination that the water is unhealthy, would conflict with the PUC's conclusion that the water is safe and would undermine its drinking water policy.

Plaintiffs in the four lawsuits dispute that all of the water alleged to be contaminated is identical to the water provided by the regulated utilities. They claim that the liability of the nonregulated water providers and the industrial defendants are not "derivative" of the water supplied by the regulated utilities. They assert that: (1) although the nonregulated water providers sold wholesale water to some of the regulated utilities, they also supplied water to nonregulated water purveyors that may have supplied water to plaintiffs; and (2) the alleged contamination of the groundwater by the industrial defendants also contaminated the groundwater used and supplied by nonregulated water providers. Plaintiffs argue, therefore, that the water and the issues are not the same.

In rejecting the preemption argument advanced by the nonregulated water providers and the industrial defendants, the Court of Appeal below stated: "Section 1759 provides that no trial level court may 'review, reverse, correct, or annul' or 'enjoin, restrain, or interfere with' the PUC in its performance of its duties. By no stretch of language or logic does this mean that trial courts may not decide issues between parties not subject to PUC regulation simply because the same or similar issues are pending before the PUC or because the PUC regulates the same subject matter in its supervision over public utilities." (Fn. omitted.)

We agree. First, although section 1759 does not expressly restrict preemption to claims involving regulated utilities, it cannot be construed in isolation; rather, it must be viewed in context with " ' "the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness." ' " (*People v. Ledesma* (1997) 16 Cal.4th 90, 95 [65 Cal.Rptr.2d 610, 939 P.2d 1310]; *County of Sacramento v. Workers' Comp. Appeals Bd.* (1999) 69 Cal.App.4th 726, 733 [81 Cal.Rptr.2d 780].) The California Constitution authorizes the PUC to establish rules only for *utilities.* (Cal. Const., art. XII, § 6.) The powers granted to the PUC by the Legislature must be "cognate and germane to the regulation of public utilities . . . ." (*Morel v. Railroad Commission* (1938) 11 Cal.2d 488, 492 [81 P.2d 144].) The Legislature specified the PUC's regulatory powers over public utilities in the Public Utilities Code, of which section 1759 is a part. Under section 1759, a superior court cannot "enjoin, restrain, or interfere with the [PUC] in the performance of its *official* duties . . . ." (Italics added.) Thus, when read in context with the entire regulatory scheme, section 1759 must be read to bar superior court jurisdiction that interferes with the PUC's performance of

its *regulatory* duties, duties which by constitutional mandate apply only to regulated utilities. Although a superior court jury may return findings on water safety issues that would conflict with those decided by the PUC on the same or similar issues, neither the nonregulated water providers nor the industrial defendants adequately explain how such conflicting findings, relating to them, would *interfere with* the PUC's *official regulatory duties.*

Second, the nonregulated defendants fail to cite case law to support their view that the jurisdictional bar of section 1759 applies to nonregulated parties. Instead, they rely on isolated statements in cases referring to the preemptive effect of issues or cases pending before the PUC. They argue that those cases do not expressly confine their preemption language to actions against regulated parties. (See, e.g., *Covalt, supra,* 13 Cal.4th at p. 944 ["[t]he question is therefore whether section 1759 applies to this *case*" (italics added)]; *id.* at p. 918, fn. 20 [" 'once [the PUC] has assumed jurisdiction, it cannot be hampered, interfered with, or second-guessed by a concurrent superior court action addressing the same *issue*' " (italics added, original italics omitted)]; *Barnett v. Delta Lines, Inc.* (1982) 137 Cal.App.3d 674, 681 [187 Cal.Rptr. 219] [same].) Because those cases involved only regulated utilities, the references to the preemptive effect of "issues" or "cases" pending before the PUC must be read in context with the facts of the case, i.e., as barring only actions brought in trial courts against regulated utilities. (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689] ["Language used in any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered"].)

Indeed, in *Covalt, supra,* 13 Cal.4th 893, and *Waters, supra,* 12 Cal.3d 1, we sought to reconcile sections 1759 and 2106. Section 2106, by its terms, applies only to a "public utility" and does not authorize lawsuits against nonregulated entities. Therefore, the rationale expressed in both cases applies only to bar superior court jurisdiction over lawsuits otherwise authorized by section 2106, i.e., cases against regulated utilities.

Third, the regulatory scheme contained in the Public Utilities Code is rooted in the recognition that business enterprises "affected with a public interest" are subject to government regulation under the state's police power. (See *Munn v. Illinois* (1876) 94 U.S. 113, 125-130 [24 L.Ed. 77, 84-86]; *Gay Law Students Assn. v. Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458, 476 [156 Cal.Rptr. 14, 595 P.2d 592].) Endowed by the state with a legally enforceable monopoly and authorized by the state to charge rates that guarantee it a reasonable rate of return (*Gay Law Students Assn., supra,* 24 Cal.3d at p. 476), a public utility, in turn, must comply with the comprehensive regulation of its rates, services, and facilities as specified in the Public Utilities

Code. (See *Pacific Gas & Elec. v. Energy Resources Comm'n* (1983) 461 U.S. 190, 205 [103 S.Ct. 1713, 1722-1723, 75 L.Ed.2d 752]; Sidak & Spulber, *Deregulatory Takings and Breach of the Regulatory Contract* (1996) 71 N.Y.U. L.Rev. 851, 907.) Thus, " 'a public utility, being strictly regulated in all operations with considerable curtailment of its rights and privileges, shall likewise be regulated and limited as to its liabilities. In consideration of its being peculiarly the subject of state control, "its liability is and should be defined and limited." [Citation.]' " (*Waters, supra,* 12 Cal.3d at p. 7; see also *Los Angeles Cellular Telephone Co. v. Superior Court* (1998) 65 Cal.App.4th 1013, 1018 [76 Cal.Rptr.2d 894] ["As our courts have long recognized, it is an equitable trade-off—the power to regulate rates and to set them below the amount an unregulated provider might otherwise charge requires a concomitant limitation on liability"].)

Finally, unlike the regulated utilities, the PUC has no jurisdiction to hear complaints or claims against any nonregulated entities. If claims against nonregulated entities were preempted by section 1759, they could not be heard in any forum.

The Court of Appeal below correctly noted that, "the nonregulated defendants do not invite us to find that the PUC has de facto authority to regulate their conduct. Some seem to be claiming only a tangential benefit from PUC regulation—a stay or preemption of actions against them—unencumbered by the burdens of PUC regulation." We conclude that section 1759 does not preempt these lawsuits in superior court against the nonregulated water providers and the industrial defendants.[13]

## CONCLUSION

In the four actions, the damage claims alleging violations of federal and state drinking water standards against the regulated utilities are not preempted. Thus, we reverse the judgment of the Court of Appeal insofar as it found preemption as to those claims. Regarding the remaining claims against

---

[13]The nonregulated water providers and the industrial defendants argue that, in the alternative, the Court of Appeal should have ordered the trial courts to stay the actions under the doctrine of primary jurisdiction, pending resolution of the PUC's water quality investigation. Because the PUC issued its final opinion in that investigation after the filing of the briefs, we need not address that claim.

In the final opinion on water quality, the PUC noticed its intention to initiate a future limited investigation into whether utilities complied with the PUC standards prior to the establishment of DHS standards. (Cal.P.U.C. Dec. No. 00-11-014, *supra,* 2000 Cal.P.U.C. Lexis 722 at pp. 16-17.) In their supplemental briefs, the industrial defendants urge us to order a stay as to claims for damages caused by water provided before the adoption of DHS standards, pending completion of the future PUC investigation. We decline to do so for obvious reasons. That claim was never made to the superior court or Court of Appeal and can be decided more appropriately by the superior court.

the regulated utilities, we affirm the judgment of the Court of Appeal. We further affirm the judgment of the Court of Appeal insofar as it held that the causes of action against the nonregulated water providers and industrial defendants are not preempted. We remand the case to that court for further proceedings consistent with this opinion.

George, C. J., Kennard, J., Baxter, J., Brown, J., and Moreno, J., concurred.

**KLINE, J.**\*—I concur and write separately to explain why I believe regulation of water quality is among the "official duties" of the Public Utilities Commission (PUC or commission). (Pub. Util. Code, § 1759.)[1] Some of my reasons go beyond those described by the majority and relate more specifically to the commission's authority to promulgate water quality standards stricter than those of the California Department of Health Services (DHS), an issue central to the jurisdictional dispute.

Plaintiffs in these actions maintain that the 1976 amendment to section 770—which eliminated the prohibition on the PUC applying its water quality standards to regulated utilities and provided instead that any such standards it may apply shall not be "inconsistent" with DHS standards—means that PUC water quality standards may not differ *in any way* from those promulgated by DHS, which would bar the commission from imposing standards higher than those of DHS. Plaintiffs' construction of the amendment renders it meaningless. If, as plaintiffs argue, the amendment means the PUC cannot apply its own standards, but only those of DHS, the amendment would have no different effect than the language it replaced, and the Legislature would have performed an idle act. Given the context in which the Legislature acted, the only sensible interpretation is that "inconsistent" means less rigorous, so that the purpose of the amendment to section 770 is analogous to that of the federal Safe Drinking Water Act (42 U.S.C. § 300f et seq.) (federal SDWA), which prohibits the states from enacting water quality standards less stringent than those established by the federal government, but permits them to impose more stringent requirements. (42 U.S.C. § 300g.)

Because, as the majority says, the Legislature established only that DHS water quality standards are "the *minimum* standards for the PUC to use in performing its regulatory function" (maj. opn., *ante*, at p. 271, italics added), the commission is free to subject regulated water utilities to stricter standards than are imposed by DHS.

---

\*Presiding Justice of the Court of Appeal, First Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] All statutory references are to the Public Utilities Code unless otherwise indicated.

The title of the PUC investigation in this case[2] reflects the commission's concern that the DHS standards it now applies may not adequately protect the public; and the PUC made clear during the proceedings that it was considering the promulgation of higher standards. As the commission stated, "we do not intend to reduce MCLs [maximum contaminant levels], Action Levels or similar standards which are terms of art in the lexicon of [Safe Drinking Water Act] law and regulation. Drinking water standards, including established MCLs, are minimum water quality requirements and we cannot and shall not tamper with those requirements. We do not intend to duplicate the processes employed by DHS and [the federal Environmental Protection Agency] to develop those standards. We do intend to employ the knowledge of these agencies as we pursue this investigation. The evidence adduced in this proceeding may support the development of additional operating practices for regulated utilities. If so, we would expect that such new rules *either will fill an identifiable void, if any there is, in the DHS regulatory scheme or will be practices stricter than those of DHS and/or they will be practices particularly suited to the regulation of investor-owned water utilities.* In any event, before we can determine what actions, if any, might better promote safe drinking water service by regulated water utilities, we must have a clear understanding of the safety status of existing regulation. Therefore, we need to receive evidence on the questions posed in the OII [Order Instituting Investigation]."[3] (Cal.P.U.C. Interim Opinion Denying Motions Challenging Jurisdiction to Conduct Investigation 09-03-013 (June 10, 1999) Dec. No. 99-06-054 [1999 Cal.P.U.C. Lexis 312 at pp. 73-74], italics added. (Interim PUC Opinion).) As the majority has noted, in its final opinion on water

---

[2] "Investigation on the Commission's own motion into whether existing standards and policies of the Commission regarding drinking water quality adequately protect the public health and safety with respect to contaminants such as Volatile Organic Compounds, Perchlorate, MTBEs, and whether those standards and policies are being uniformly complied with by Commission regulated utilities." (Cal.P.U.C. Order Instituting Investigation No. 98-03-013 (Mar. 12, 1998) [1998 Cal.P.U.C. Lexis 73].)

[3] These statements appear to represent a substantial policy change for the PUC, as the commission has heretofore consistently and rather summarily rebuffed consumer complaints that the DHS standards it applies are inadequate. For example when, in 1966, the PUC was asked to order "optimum" fluoridation of drinking water, the commission held: "With respect to the purity and safety of drinking water, the Commission will not question the findings and recommendations of the California Department of Health, which is charged with such responsibility." (*City of San Jose v. San Jose Water District* (1966) 66 Cal.P.U.C. 694, 698.) Similarly, in 1972, the PUC again rejected complaints concerning the quality of a purveyor's water: "The State Board of Public Health [DHS] has the authority . . . to suspend or revoke a utility's water permit at any time if it determines that the water is or may become unpure or unwholesome. Under [the Health and Safety Code], and in accordance with General Order 103, it is not appropriate for the Commission to determine this question. Petitioners should direct their allegations on this question to the [DHS]." (*Washington Water & Light Co.* (1972) 73 Cal.P.U.C. 284, 303; see also *Pool v. Mokelumne River Power & Water Co.* (1918) 15 C.R.C. 38, 39 ["[t]he question of the healthful quality of the water is one to be passed on by the State Board of Health."].)

quality the PUC ordered a subsequent investigation and/or rulemaking proceeding to consider, among other things, whether DHS's "action levels," which are neither mandatory nor enforceable, should be mandatory for regulated utilities. (Maj. opn. *ante*, at p. 271, fn. 9.) Such a PUC rule would impose water quality standards higher than those imposed by DHS.

The substance of the PUC proceedings demonstrates that the commission is discharging its responsibility under section 761 to inquire whether the "practices" of or "service[s]" provided by defendant regulated water utilities are "unsafe," and, if so, to fix the problem by "prescrib[ing] rules for the performance of any service or the furnishing of any commodity . . . supplied by any public utility." In short, the PUC inquiry into the adequacy of DHS standards, and any higher standards it may impose, are or would be in the performance of its "official duties" (§ 1759) to protect the public health and safety.

Significantly, DHS, which actively participated in the commission proceedings, never suggested that the PUC's expressed interest in whether it needed to exercise its authority to subject regulated water utilities to water quality standards higher than those of DHS would, if acted upon, offend the federal SDWA or the state Safe Drinking Water Act (Health & Saf. Code, § 116275 et seq.) (state SDWA), and the DHS expressed no other objection to PUC assertion of authority to impose water quality standards higher than its own. On the contrary, DHS explained why it might be appropriate for the PUC to subject the almost 200 water utilities it regulates to higher standards than does DHS. According to DHS, " 'the increase in population growth and demand for drinking water throughout the state has diminished the options utilities have to reserve and select high quality sources of drinking water. The impact of groundwater contamination from industrial and agricultural practices has been significant in some areas of the state. Public water systems are no longer able to forego the use of contaminated drinking water sources, including those associated with Superfund sites, since that water may be needed to meet increased demand.' " (Interim PUC Opinion, *supra*, 199 Cal.P.U.C. Lexis 312 at p. 76.) Moreover, as DHS specifically acknowledged, "[t]here are some contaminants that were known to exist in drinking water sources *but were never regulated.*" (*Ibid.*, italics added.)

DHS's conduct in the PUC proceeding demonstrates that it does not believe the state SDWA (or the memorandum of understanding DHS originally entered into with the PUC in 1987) would prevent the PUC from imposing water quality standards higher than its own, or that such standards, including those pertaining to contaminants for which there now are no enforceable DHS standards, would be "inconsistent" with DHS standards. As the primary agency charged with implementing the state SDWA, DHS's

view is entitled to judicial respect. The questions whether an administrative agency properly applies legislative standards and acts within authority conferred by the Legislature are, of course, ultimately decided by the courts (*Quackenbush v. Mission Ins. Co.* (1996) 46 Cal.App.4th 458, 466 [54 Cal.Rptr.2d 112]), but an administrative agency's "interpretation of a statute it routinely enforces is entitled to great weight and will be accepted unless its application of legislative intent is clearly unauthorized or erroneous." (*American Federation of Labor v. Unemployment Ins. Appeals Bd.* (1996) 13 Cal.4th 1017, 1027 [56 Cal.Rptr.2d 109, 920 P.2d 1314], citing *Pacific Legal Foundation v. Unemployment Ins. Appeals Bd.* (1981) 29 Cal.3d 101, 109 [172 Cal.Rptr. 194, 624 P.2d 244].)

Neither does PUC's General Order 103 bar the PUC from imposing higher water quality standards in the future. While at present this order only requires compliance with federal and state water quality standards, the phrase "except as otherwise ordered by the Commission," must be interpreted as reserving the right to impose the higher standards the commission is allowed to impose under section 770. In any event, as the PUC had the authority to adopt General Order 103, so too does it retain power to repeal or amend it so that it is consistent with the imposition of PUC water quality standards higher than those promulgated by DHS.

For the foregoing reasons, as well as those set forth by Justice Chin for the majority, I agree that the PUC has independent regulatory authority to promulgate water quality standards applicable to the water utilities it regulates and that such standards may be the same as or stricter (but not less strict) than those promulgated by DHS under the state SDWA. There may be circumstances in which a superior court award of damages for injuries sustained by the provision of water standards or other rules applied by the PUC might interfere with the PUC's performance of its "official duties," and therefore violate section 1759,[4] but, as the majority has explained, they are not presented by this case.

---

[4]For example, under section 735 the PUC has authority to receive and rule on claims for damages resulting from the violation of any of the provisions of sections 494 (relating to common carrier rates and fares) or 532 (relating to the rates, tolls, rentals and other charges imposed by public utilities), even though a suit seeking such damages could alternatively be instituted "in any court of competent jurisdiction." Section 1759 would clearly bar a superior court from entertaining a claim for damages for violation of section 494 or 532 that had previously been submitted to and rejected by the commission.