Filed 12/2/14  Shin v. BNSF Railway Co. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| YONGPAL SHIN, | |
| Plaintiff and Appellant, | E060056 |
| v. | (Super.Ct.No. RIC10016873) |
| BNSF RAILWAY COMPANY, | **OPINION** |
| Defendant and Respondent. | |

APPEAL from the Superior Court of Riverside County.  Daniel A. Ottolia, Judge.
Affirmed.

Law Offices of Baird A. Brown and Baird A. Brown, for Plaintiff and Appellant.

Sims Law Firm, Michael E. Murphy, and Selim Mounedji, for Defendant and
Respondent.

Plaintiff and Appellant Yongpal Shin appeals the grant of summary judgment in
favor of defendant and respondent BNSF Railway Company (BNSF).  Shin's 14-year-old
son, Samuel Shin, was hit by a Metrolink train while crossing the tracks on his way to
Arlington High School in Riverside.  At the crossing where Samuel was hit, there were

1

two sets of tracks. Just prior to the accident, the bells and lights were activated and the gate for cars came down in anticipation of a first train that was going to go through the crossing. Samuel waited as the first train passed in the westbound direction. However, once it passed, and despite the car gates still being down and the lights still being activated, he went under or around the gate and crossed the tracks. Tragically, at that same time, a train was traveling eastbound on the other set of tracks. Samuel was hit by the train and died at the scene.

Shin filed a complaint against several defendants, including BNSF. He filed suit for negligence and premises liability. Shin contended that despite all of the existing warnings in place, which complied with orders promulgated by the California Public Utilities Commission (CPUC), BNSF had a duty to install pedestrian gates and additional warning signs for the two sets of tracks. BNSF filed a motion for summary judgment and the trial court granted BNSF's summary judgment motion.

Shin claims on appeal that there was a triable issue of fact as to BNSF's negligence in failing to put in additional warning devices at the grade crossing, such as a pedestrian gate and/or some additional warning about the potential for encountering two trains at the same time at the grade crossing. We conclude that the motion for summary judgment was properly granted.

I

STATEMENT OF FACTS

The following facts are taken from the undisputed material facts presented by BNSF, the additional facts provided by Shin to which BNSF objected but that objection

2

was overruled by the trial court and other documents attached to the moving papers as necessary.

Samuel was 14 years old when he was struck by a train while attempting to cross two sets of railroad tracks at the Jackson Street crossing in Riverside on April 22, 2009. Samuel had to cross the tracks to get to Arlington High School. He had crossed the tracks approximately 140 to 147 times prior to that day. Samuel was familiar with the crossing and knew there were two sets of tracks. As he walked toward the railroad tracks that day, another student, David Mount, walked several feet behind Samuel.

The two sets of tracks at Jackson Street were clearly visible as pedestrians approached the crossing. The railroad grade crossing was equipped with the usual active warning devices, which included red flashing lights, red and white crossing gates, and audible bells. The crossing also had passive warning devices that included a sign warning of two tracks, railroad cross-bucks and the two sets of tracks that were clearly visible. These warning devices were clearly visible to Mount and Shin.

As Shin and Mount approached the crossing, the flashing lights, bells and the lowering car gates provided audible and visual warnings of an approaching train. A train was traveling westbound and sounded its horn. Shin and Mount both stopped out of harm's way of the first train. Both Mount and Shin waited until the first train passed the crossing.

After the westbound train cleared the crossing, the crossing warning devices continued to be activated. In addition to these warnings, a second train, that was traveling eastbound, sounded its horn. The eastbound train was clearly visible from

3

where Samuel and Mount stopped to wait for the westbound train. The warning devices operated normally at all times and provided over 40 seconds of constantly active warning of the approaching trains.

Despite the warning devices still being activated, Samuel "negligently" started to move across the railroad tracks. Mount yelled to Samuel to stop because he saw the approaching eastbound train. Samuel did not respond and was hit by the train.

In 1974, the CPUC authorized a request from the City of Riverside to update the Jackson Street crossing to include four CPUC Standard No. 9 automatic car gates and they were installed in 1975. In 1995, a second set of tracks was installed at the crossing. Samuel was the only pedestrian versus train accident that had ever occurred at the Jackson Street grade crossing.

At the time of the accident, the warning devices at the Jackson Street crossing consisted of CPUC Standard No. 8 flashing lights, CPUC Standard No. 9 automatic gates, crossbuck signs, and "two track" signs, which complied with CPUC General Order 75-D (75-D) which was the regulatory order for crossings for cars and pedestrians. The segment at the Jackson Street crossing was authorized to have trains travel at a maximum speed of 80 miles per hour.

Shin presented additional facts that the train that hit Samuel was traveling at 55 miles per hour and only five or six seconds elapsed between the time the first and second train passed the crossing. The crossing abutted Arlington High School. It had no pedestrian protection such as gates, barriers, walkways or overpasses. The car gates did not extend over the sidewalk. It was a rare occurrence for two trains to converge at the

4

Jackson Street crossing; Mount estimated it was once or twice each month. Mount had taken a step toward the tracks after the first train passed, but stopped because he heard the second train and saw it approaching. Samuel did not appear to hear Mount yell at him to stop.

II

PROCEDURAL BACKGROUND

A.    *Complaint*

Shin filed a wrongful death action against Southern California Regional Rail Authority (SCRRA) dba Metrolink; Riverside Unified School District; and BNSF on February 8, 2010.[1] He alleged causes of action for general negligence and premises liability. He specifically alleged against BNSF as to negligence and premises liability that "Defendants negligently maintained a dangerous condition (railroad crossing unguarded as to pedestrians), failed to warn of the dangerous condition, failed to protect against the dangerous condition, and failed to take precautions to protect school students such as Samuel Shin."

It was further alleged that BNSF owned public property upon which a dangerous condition existed, the public entity had actual notice of the existence of the dangerous condition in sufficient time prior to the injury to have corrected it, and the condition was created by employees of the defendant public entity.

BNSF filed an answer denying all of the allegations in the complaint.

---

[1]    BNSF is the only defendant remaining in this case as the school district was dismissed in the trial court and Shin dismissed his appeal against Metrolink.

5

B.    *Summary Judgment Motion Filed by BNSF*

On January 26, 2012, BNSF filed its summary judgment motion.  The motion was based on the separate statement of undisputed facts, the declarations of Dennis Skeels, John Shurson and David Mount, and other attached exhibits.  It asked for summary adjudication of seven issues as follows:

Issue 1:  BNSF contended it complied with its duty to provide reasonable warning of the presence of the tracks.  The warning devices all worked.  It argued that there were clearly visible and audible warnings of the dual tracks.  This included red flashing lights, red and white crossing gates, and audible bells.  There were signs warning of two tracks, railroad cross-bucks, and the two tracks were clearly visible.  Shin stopped for the first train showing the tracks and warnings were visible to him.

Issue 2:  BNSF contended that it had no duty to install other warning devices at the Jackson Street crossing such as pedestrian gates, barriers, walkways, or to put other warning signs.  BNSF argued that the two tracks at the Jackson Street crossing were open and obvious, and therefore, the conditions served as a reasonable warning.  It had no duty to warn that trains may use both sets of tracks at Jackson Street.

As part of this argument, BNSF contended that it was precluded by state law from putting up additional warning devices and signs.  BNSF stated that the CPUC had the exclusive regulatory authority and 75-D defined the scope of adequate warning devices at public railroad grade crossings in California.  According to 75-D, the warnings required were two Standard No. 8 flashing lights, bells, and four Standard No. 9 automatic gates.

6

In addition, California Public Utilities section 1759[2] states that the CPUC has exclusive jurisdiction to regulate warning devices and construction of railroad crossings. This precluded superior court intervention about the adequacy of the warnings at Jackson Street.

BNSF also cited to section 1202, which provides that the CPUC has the exclusive power over installation, alteration, operation, maintenance, use and protection at grade crossings. 75-D was the exclusive regulation on the warning devices required for crossings. Moreover, the CPUC had to approve any additions to the approved warnings. Shin did not allege that the exiting warning devices at the Jackson Street crossing violated 75-D. The trial court lacked subject matter jurisdiction to base a finding of negligence and damages on the existence, adequacy, and safety of the CPUC authorized signs and devices. Finding that the warning devices were inadequate would interfere with the regulatory power of the CPUC. BNSF had a complete defense to the negligence and premises liability claims regarding its duties at the crossing.

BNSF also claimed that it would have been illegal for it to post an additional warning sign because local authorities had jurisdiction over Jackson Street.

Issue 3: BNSF also contended it had no duty to provide a crossing guard. That was controlled by city or county government.

Issue 4: BNSF further argued that no evidence supported the elements of a dangerous condition of property. BNSF alleged that the railroad track itself was a

---

**2** All further statutory references are to the California Public Utilities Code unless otherwise indicated.

7

warning of possible danger. BNSF complied with reasonable warning of the presence of the tracks and the crossing had been safely crossed for 50 years before the accident involving Samuel. Samuel himself had crossed 140-147 times without incident.

Issue 5: BNSF also provided that it had done nothing or failed to do anything that caused or contributed to the accident. The undisputed facts proved that BNSF was free of negligence. Samuel's negligence was the only substantial factor in causing the accident. Samuel was negligent per se. Samuel ignored the warning devices that were in place.

Issues 6 and 7 involved preemption by federal law as to the speed of the trains and two trains passing each other at the crossing.

BNSF attached several exhibits. Shawn Casteel was a police officer. In his deposition, he stated that Vehicle Code section 22451 required a pedestrian shall not proceed if a "'clearly visible electric or mechanical signal gives warning of the approach or passage of a train' and '[a]n approaching train is plainly visible or emitting an audible signal and by reason of its speed or nearness is an immediate hazard.'" In his opinion, Samuel violated the Vehicle Code.

BNSF also attached 75-D. It included language that, "IT IS HEREBY ORDERED by the Public Utilities Commission of the State of California, that the following regulations governing the standards for warning devices for at-grade highway-rail crossings for motor vehicles, pedestrians, and/or bicycles, hereinafter referred to as at-grade crossings, be observed in this State unless otherwise authorized or directed by the Commission." The purpose of the rules was "to reduce hazards associated with at-grade

8

crossings by establishing uniform standards for warning devices for at-grade crossings in the State of California, . . ."

75-D then set forth the specifications for crossings: (1) crossbuck sign; (2) Standard No. 8, which was defined as an automatic flashing light signal, which flashed red lights when a train was approaching; (3) Standard No. 8-A which required additional flashing lights on a cantilever arm; and (4) Standard No. 9 which was an automatic gate arm with Standard No. 9-A flashing lights. The gate must have arms down 20 seconds before at-grade crossing by a train and not go up until the back of the train clears the crossing and no other train is approaching. Bells must be included with automatic warning devices. As for modifications of these warnings, 75-D provided, "The removal, reduction, *addition*, or change in type of warning devices at each public at-grade crossing, . . . shall not be permitted unless authorized by the Commission."

C. *Shin's Opposition to the Summary Judgment Motion Filed by BNSF*

Shin filed his opposition to BNSF's summary judgment motion on March 28, 2012. Shin relied upon a 2006 meeting where representatives from the CPUC, Metrolink and BNSF inspected the Jackson Street crossing. He alleged that at that time, they agreed that the crossing was a pedestrian safety concern because of the proximity to Arlington High School. All three entities agreed that the crossing should be '"treated for pedestrian usage which would include . . . pedestrian gates and emergency exit swing gates.'" Shin alleged that other students at the crossing would cross the tracks immediately after a first train passed while the car gates were still down. Shin additionally alleged that the

9

standard of care applicable to Samuel was a special subjective standard; not an objective standard due to his age.

Shin addressed each of the issues raised by BNSF. First, BNSF did not provide reasonable warning of the presence of two sets of tracks. Drivers were blocked by gates but pedestrians were not. There was no reasonable warning of the unexpected convergence of two trains next to Arlington High School at 7:30 a.m. on a school day. Second, BNSF had a duty to install other warning devices. The CPUC's 75-D did not preempt the BNSF's duty to install additional pedestrian warnings. Further, the CPUC had recommended a pedestrian gate in 2006. Third, Shin argued that Samuel did not violate Vehicle Code section 22451, subdivision (a)(1) because no signal or device warned of a *second* train. Shin argued that whether BNSF was negligent was a jury question.

Shin did not contest BNSF's argument that it couldn't install signs because that duty belonged to state and local authorities. Shin did not contest that BNSF had no duty to provide a crossing guard. Further, Shin did not contest that he had no evidence to support the essential elements of a dangerous condition of public property claim. Further, Shin did not contest that BNSF's argument that train speed and two trains passing was preempted by federal law. Shin concluded that there were triable issues of BNSF's duties and negligence.

Shin attached to his opposition the Consumer Protection and Safety Division Rail Crossings Engineering Section meeting notes, e.g. notes from the meeting on the Jackson Street crossing in 2006. The subject of the notes was "Riverside Quiet Zone" and the

10

notes were dated February 8, 2006. The notes provided a meeting was conducted to discuss the City of Riverside's plans to establish a "Quiet Zone" for several crossings, including at the Jackson Street Crossing. Both BNSF and Metrolink operated trains on these tracks.

With the quiet zone, signs stating "no train horn" would have to be installed. In addition, a traffic signal before the tracks should be installed. It also noted, "All Pedestrian Approaches shall be equipped with tactile strips as a minimum in absence of any other pedestrian improvements." It also included, "All crossings which have pedestrian approaches should be equipped with flange-way gap filler. This device eliminates the gap in the path of travel for pedestrians crossing railroad tracks."

The notes included language, "Due to the nearby school on Indiana Avenue between Gibson and Jackson Street, pedestrian safety was a concern at this crossing." The City of Riverside was to conduct a study of the number of pedestrians crossing at the Jackson Street crossing. It also included, "[B]NSF . . . recommended the east side of the crossing be treated for pedestrian usage which would include extending the sidewalk over the crossing, pedestrian gates, and, emergency exit swing gates. Because there was no sidewalk on the west side of the crossing, the diagnostic team recommended the existing fencing be moved closer to the roadway to discourage pedestrian usage. In addition it was recommended that the City place uninviting vegetation on the west side of the crossing to further discourage pedestrian usage."

11

D.    *BNSF's Reply To Shin's Opposition*

BNSF filed objections to Shin's separate statement of undisputed facts.[3]  BNSF first noted that Shin admitted almost all of the undisputed facts provided by BNSF. BNSF then recounted what Shin had admitted, which included that Samuel was familiar with the two tracks and crossing, that the existing warnings and lights all were functioning, and that BNSF had complied with the CPUC regulations for the crossing. BNSF contended that based on the undisputed material facts, the mere presence of the two train tracks gave adequate warning of the dangerous condition, and even if there was more warning required, BNSF had no duty to provide additional warnings.  BNSF complied with the only requirements for the crossing and that did not include pedestrian gates, barriers, walkways or overpasses.  Further, Shin was essentially arguing that the state standards of warning signs at Jackson Street were inadequate and that was within the purview of CPUC.

In addition, BNSF attached a deposition of John Shurson who worked for BNSF. He had attended the 2006 meeting.  He stated that the meeting "subject matter . . . was to review the crossing for a proposed quiet zone."  Shurson also stated he was concerned about pedestrian safety "at quiet zones."  He stated that the flashing lights and bells that were in existence at the Jackson Street crossing had been determined adequate for pedestrians.

---

[3]     Since the trial court overruled the objections, we need not set forth the objections here and we have included these facts in the statement of facts.

12

E.    *Ruling*

The trial court initially noted at the hearing that premises liability was no longer an issue as to BNSF; Shin's argument was that BNSF was negligent. It tentatively ruled, "The undisputed facts, as the Court finds them with regards to the negligence claim, are that the defendants were not negligent. Everything was functioning as it should have functioned. There was compliance with local, state, and federal laws. And the undisputed facts indicate that neither of the defendants had the ability to change the intersection warning devices, even if they wanted to, because those are within the purview of the California Public Utilities Commission and federal government."

Shin argued that in 2006, Shurson had discussed with the CPUC adding additional pedestrian gates at the Jackson Street crossing. The trial court responded that BNSF was arguing that these gates were only being considered if the crossing became a quiet zone. Shin disagreed and argued that the testimony of Shurson was unequivocal that there was concern about pedestrian's crossing the Jackson Street crossing regardless of the quiet zone consideration. Shin argued the gates did not extend onto the sidewalk. The incident would not have occurred had a pedestrian gate been installed. Shin also argued under CPUC order 88-B it was a simple procedure to get approval from the CPUC to have pedestrian protection installed. BNSF only needed to request the addition.

BNSF referred to Shurson's deposition that the concern about pedestrian safety was only if a quiet zone was required and the trains would not use their horns. BNSF again argued that the warning devices all complied with 75-D. This was a CPUC preclusion issue. The CPUC had exclusive jurisdiction over the railroad crossing and

made orders as to how crossings should be regulated. The trial court took the matter under submission.

In its written ruling submitted on April 20, 2012, the trial court granted BSNF's summary judgment motion. It found as follows: "The Court finds there is no triable issue of material fact as to the Defendant's lack of authority to control the warning devices at the crossing . . . [¶] The Court finds there is no triable issue of material fact that all warning devices were operational at the time of the incident. [¶] There is no triable issue of material fact, based on eyewitness accounts, that the decedent ignored all of the warning devices and proceeded to cross the railroad tracks." Judgment was entered on May 14, 2012. BNSF was originally awarded no attorney fees or costs. That judgment was later corrected to award BNSF $5,880.75 in costs.

Shin filed his notice of appeal on July 12, 2012.

III

STANDARD OF REVIEW

Summary judgment properly is granted if the "affidavits, declarations, admissions, answers to interrogatories, depositions, and matters of which judicial notice shall or may be taken" in support of and in opposition to the motion "show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subds. (b)(1) & (c).)

"On review of a summary judgment in favor of the defendant, we review the record de novo to determine whether the defendant has conclusively negated a necessary element of the plaintiff's case or demonstrated that under no hypothesis is there a material

14

issue of fact that requires the process of trial.  [Citation.]" (*Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 673-674, disapproved on other grounds in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512.)  "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, fn. omitted.)

"A defendant moving for summary judgment must prove the action has no merit. He does this by showing one or more elements of plaintiff's cause of action cannot be established or that he has a complete defense to the cause of action.  At this point, plaintiff then bears the burden of showing a triable issue of material fact exists as to that cause of action or defense." (*Towns v. Davidson* (2007) 147 Cal.App.4th 461, 466.)

IV

ANALYSIS

We conclude that the claims raised by Shin against BNSF were precluded under section 1759 as the CPUC had exclusive regulatory authority over warnings required at railroad crossings.

"[O]ur state Constitution . . . in article XII . . .  Section 3 . . . provides, as relevant here, that '[p]rivate corporations and persons that own, operate, control, or manage a line, plant, or system for the transportation of people or property . . . , and common carriers, are public utilities subject to control by the Legislature.'  Under this provision, 'all railroad carriers [are] subject to legislative control . . . .'  [Citation.]  Section 1 of article XII provides for the composition of the commission, and section 4 gives the commission

15

the power to 'fix rates and establish rules for the transportation of passengers and property by transportation companies' (among other things)." (*BNSF Railway Co. v. Public Utilities Com.* (2013) 218 Cal.App.4th 778, 783-784.)

"Pursuant to this grant of power the Legislature enacted Public Utilities Code section 701, conferring on the commission expansive authority to '*do all things*, whether specifically designated in [the Public Utilities Act] *or addition thereto*, which are necessary and convenient' in the supervision and regulation of every public utility in California. . . . The commission's authority has been liberally construed. [Citations.] Additional powers and jurisdiction that the commission exercises, however, 'must be cognate and germane to the regulation of public utilities. . . .' [Citations.]" (*Consumers Lobby Against Monopolies v. Public Utilities Com.* (1979) 25 Cal.3d 891, 905.)

Section 1759, subdivision (a) provides: "No court of this state, except the Supreme Court and the court of appeal, to the extent specified in this article, shall have jurisdiction to review, reverse, correct, or annul any order or decision of the commission or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the commission in the performance of its official duties. . . ." A decision of the CPUC is subject only to writ review by a Court of Appeal or the Supreme Court. (§§ 1756, subd. (a), 1757, 1757.1, 1759.) Section 1201 gives the CPUC the power to permit the construction of crossings of a "public road, highway, or street" and "the track of any railroad corporation." Subdivision (a) of section 1202 further provides in relevant part that the CPUC has the exclusive power "[t]o determine and prescribe the manner, including the particular point of crossing, and the terms of installation, operation,

16

maintenance, use, and protection of . . . each crossing of a public or publicly used road or highway by a railroad." However, section 2106 provides that trial courts have the authority to entertain a private action for damages arising out of any unlawful act by a regulated utility, including the violation of any PUC order or decision. (§ 2106) "Our high court has addressed the apparent tension between these two sections of the Public Utilities Act in several decisions. [Citations.]" (*Guerrero v. Pacific Gas & Electric Co.* (2014) 230 Cal.App.4th 567, 572 *(Guerrero)*.)

"[A]n action for damages against a public utility . . . is barred by section 1759 not only when an award of damages would directly contravene a specific order or decision of the commission, i.e., when it would 'reverse, correct, or annul' that order or decision, but also when an award of damages would simply have the effect of undermining a general supervisory or regulatory policy of the commission, i.e., when it would 'hinder' or 'frustrate' or 'interfere with' or 'obstruct' that policy." (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 918, fn. omitted (*Covalt*).)

In *Covalt,* the Supreme Court established a three-part test for determining whether an action is barred under section 1759: (1) "whether the commission has the *authority* to adopt a policy" (*id.* at p. 923; see also *id.* at pp. 923-925); (2) "whether the commission has *exercised* th[at] . . . authority" (*id.* at p. 926; see also *id.* pp. 926-934); and (3) "whether the present superior court action would hinder or interfere with that policy" (*id.* at p. 935; see also *id.* at pp. 935-943).

In *Hartwell Corp. v. Superior Court* (2002) 27 Cal.4th 256 (*Hartwell*), the court considered whether CPUC regulated water companies (and those not regulated by the

17

CPUC) could be sued for supplying unsafe drinking water. The court allowed the plaintiff to sue on a claim that the defendants had supplied water that did not meet state and federal drinking water standards, but did not allow claims to proceed on a theory that the drinking water standards utilized by the PUC were themselves inadequate. (*Id.* at pp. 276-277, 278-279.) Specifically, it held that "[a]n award of damages on the theory that the public utilities provided unhealthy water, even if that water actually met . . . [C]PUC standards, would interfere with a 'broad and continuing supervisory or regulatory program' of the [C]PUC." (*Id.* at p. 276.)

The recent appellate court case of *Guerrero*, which arose out of a natural gas pipeline explosion that occurred in San Bruno, California, and caused death and extensive property damage, further espouses that the superior court cannot interfere with the broad power of the CPUC. Plaintiffs sued Pacific Gas & Electric Company on the grounds it "[m]isrepresented and concealed material facts from plaintiffs when it used money collected from ratepayers to pay shareholders and provide bonuses to its executives instead of spending the money on infrastructure and safety measures. Additionally, the class alleged that PG&E's negligent handling of the pipe that exploded in San Bruno was unlawful and arose from PG&E's corporate culture that valued profits over safety." (*Id.* at p. 570].) The trial court granted PG&E's demurrer to the complaint on the ground that under section 1759, subdivision (a), the superior court lacked jurisdiction because the litigation would interfere with the CPUC's exercise of its jurisdiction. (*Id.* at p. 571.)

On appeal, the *Guerrero* court found, using the *Covalt* three-part test, that the CPUC had the authority to set rates and had exercised its regulatory authority.

18

(*Guerrero, supra,* at pp. 572-573.) It found as to the third prong, "[t]hat upon a fair reading of the record of the administrative proceedings before the PUC, plaintiffs' action seeking disgorgement, restitution, and damages for misappropriation of PUC approved funds interferes with the PUC's ongoing authority over natural gas rates." (*Id.* at p. 574].) It concluded that to allow a claim by the plaintiffs would hold PG&E liable for charging rates expressly authorized by the CPUC. (*Id.* at p. 577.)

The *Guerrero* court distinguished its facts from *Mata v. Pacific Gas & Electric* (2014) 224 Cal.App.4th 309. It founds as follows: "In *Mata*, we considered whether an order by the [C]PUC that established the minimum clearances of trees from high voltage lines could bar an action for damages for wrongful death brought by the heirs of a decedent killed in a tree trimming accident. In determining the action could proceed, we concluded that the [C]PUC orders in question established a minimum standard that would relieve PG&E of any claim of negligence per se, but did not establish a maximum clearance. Hence, a private action could be brought on the basis that the trees in question should reasonably have been trimmed to allow for greater clearance from high voltage lines than required by the [C]PUC, and allowing such an action to proceed would complement rather than hinder the [C]PUC's jurisdiction. [Citation.] The private action asserted here is quite different. The [C]PUC has in the past approved a precise measure of rates chargeable by PG&E to its natural gas customers. Since the San Bruno explosion, [C]PUC proceedings have taken into account the proper measure of expenses for improvements to the natural gas transmission system that should be borne by PG&E shareholders, and those that can be passed along to ratepayers. The ratepayers have

19

received recompense in these proceedings to the extent that PG&E shareholders have had to bear the expense for improvements that otherwise would have been passed along to its customers. Whether or not more should be done for ratepayers in these circumstances is and remains for the [C]PUC to decide, not the courts." (*Guerrero, supra,* at p. 576.)

In applying the three-part test in *Covalt* here, the first two parts are not disputed by Shin. It is clear that the CPUC had the authority to adopt 75-D and it exercised that authority. Shin's claim is based on an argument that BNSF had an obligation to provide additional warning signs despite meeting the CPUC guidelines at the Jackson Street crossing. This involves a consideration of *Covalt's* third prong.

A finding that BNSF should have applied for additional pedestrian warning gates or warning signs as to the convergence of two trains would interfere and undermine the CPUC's authority to regulate at-grade crossings. 75-D covered the requirements at an at-grade crossing for both cars and pedestrians. 75-D provided the "STANDARD WARNING DEVICES." It addressed where a "Number of Tracks" sign should be placed. The only modifications to this policy were by approval of the CPUC. This was not a minimum requirement at the crossings; it was the required standards set specifically by the CPUC.

Shin argues that BNSF could have easily requested additional pedestrian gates and warning signs for the two trains converging at the crossing. However, such argument assumes that the warning devices at the crossing, which complied with the CPUC orders, were inadequate. A finding that BNSF failed to provide additional warning signs would interfere with the CPUC's "broad and continuing supervisory or regulatory program"

20

regarding railroad crossings.  (*Hartwell, supra,* 27 Cal.4th at p. 276.)  This is not a case like *Hartwell* where some of the claims could be pursued because the plaintiffs alleged that CPUC regulations were not followed.  (*Id.* at pp. 276-278.)  It must be remembered that Shin admitted that "[t]he warning devices at the Jackson Street grade crossing at the time of the accident consisted of CPUC Standard No. 8 flashing lights, CPUC Standard No. 9 automatic gates, crossbuck signs, and 'two track' signs, which complied with CPUC General Order 75-D."  As such, Shin was precluded from bringing such claims as the superior court lacked subject matter jurisdiction.

Defendant has made general statements that 75-D does not have a preclusion or preemption clause, that *Hartwell* had nothing to do with railroad crossings, and that he would be left with no state or federal remedy.  These arguments are not supported by proper legal authority or analysis and we need not consider them.  (Cal. Rules of Court, rule 8.204 (a)(1)(B); *Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1248 ["[A]rgument must include legal analysis."].)

Defendant cites to *Hogue v. S. Pac. Co.* (1969) 1 Cal.3d 253, contending that the CPUC standards only provide for a "minimum" measure of care and that  BNSF may be required to provide additional safety measures depending upon the circumstances.  *Hogue* involved a wrongful death action in which the decedent drove his car across the railroad tracks and was hit by a train.  The jury found for the plaintiffs on a theory that the defendants should have provided an additional set of signals at the crossing.  On appeal, the defendants argued that the jury verdict was improper because they had complied with

21

CPUC orders regarding the warnings and lights required at railroad crossings. (*Id.* at pp. 256-258.)

The *Hogue* court determined that "[i]t was a question of fact for the jury as to whether defendant was negligent in failing to provide an additional set of signals" at the crossing. (*Hogue, supra,* at p. 258.) It based its finding on the fact that "General order 75B [the predecessor to 75-D] further specifies that the range of the signal lights be, on tangent, at least 300 feet." It found the jury could have concluded, based on the evidence presented, that the defendants did not comply with this order. (*Ibid.*) Thereafter, the court made the following statement: "However, even if there had been literal compliance with General Order 75B [,] "'It is well settled that such statutory regulations constitute only the minimum measure of care required by the railroad, and it is usually a matter for the jury to determine whether something more than the minimum was required under the evidence in the case." [Citation.] A railroad company is not necessarily free from negligence, even though it may have literally complied with safety statutes or rules. The circumstances may require it to do more. [Citation.]' [Citations.]" (*Ibid.*)

Initially, the *Hogue* court never discussed section 1759. Moreover, since it already found that the defendants had not complied with the CPUC orders, it is arguably dicta to find that the 75B orders were only a minimum requirement. Finally, since that time, the Supreme Court has decided *Hartwell* and *Covalt* which have found that the CPUC has broad authority over public utilities and the court cannot interfere with that authority. We need not follow *Hogue*.

22

Finally, Shin argues that the CPUC had recommended in 2006 that pedestrian gates and further warnings be installed.  However, the evidence presented to the trial court was clear that additional gates were recommended only if the crossing was converted to a quiet zone.

Based on the foregoing, the trial court properly granted BNSF's motion for summary judgment.

V

DISPOSITION

The judgment is affirmed.  BNSF is awarded its costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI _____
J.

We concur:

RAMIREZ _____
P. J.

HOLLENHORST _____
J.