Filed 1/25/16

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR


| | |
|---|---|
| PHILLIPPE LEFEBVRE, | B258175 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC472869) |
| v. | |
| SOUTHERN CALIFORNIA EDISON, | |
| Defendant and Respondent. | |


APPEAL from a judgment of the Superior Court of Los Angeles County, Amy D. Hogue, Judge. Affirmed.

Kearney Littlefield, Thomas A. Kearney, Prescott Littlefield; Ringler-Schmidt, Jerome L. Ringler and Catherine B. Schmidt; Law Office of Shea S. Murphy, Shea S. Murphy; Esner, Chang & Boyer, Stuart B. Esner for Plaintiff and Appellant.

Steptoe & Johnson, Laurie Edelstein and Seth R. Sias for Defendant and Respondent.

Plaintiff Phillippe Lefebvre filed a putative class action suit against defendant Southern California Edison Company (Edison). In his second amended complaint, Lefebvre alleged that Edison fraudulently enrolled ineligible customers in the California Alternate Rates for Energy (CARE) program, which provides rate assistance to low-income electricity and gas customers. The CARE program is subsidized by all other ratepayers, and Lefebvre alleged that Edison's practice of enrolling ineligible participants caused the CARE program surcharge he and other ratepayers were assessed to be higher than it should have been.

The trial court sustained Edison's demurrer to the second amended complaint without leave to amend. The court did not address Edison's argument that the court lacked jurisdiction to hear the second amended complaint under Public Utilities Code section 1759, subdivision (a).[1] Instead, it concluded that the action was barred by section 532, which prohibits a public utility from "refund[ing] or remit[ting], directly or indirectly, in any manner or by any device, any portion of the rates, tolls, rentals, and charges" specified in a filed tariff.

We begin and end our de novo review with Edison's jurisdictional argument, which the parties have fully briefed. We conclude that section 1759, subdivision (a) forecloses Lefebvre's claims because a judgment in his favor would have the effect of undermining a general supervisory or regulatory policy of the California Public Utilities Commission (the commission or PUC). We further conclude that the trial court properly exercised its discretion in sustaining the demurrer without leave to amend. Accordingly, we affirm the judgment.

## FACTUAL BACKGROUND

In an appeal arising from the sustaining of a demurrer, we accept as true the material allegations of the complaint. (*Carter v. Prime Healthcare Paradise Valley LLC*

_____

[1] All further statutory references are to the Public Utilities Code unless otherwise indicated.

2

(2011) 198 Cal.App.4th 396, 401.)  The pertinent facts as alleged in the second amended complaint, the operative pleading, are summarized as follows.[2]

## A.    *The parties*

Edison is a public utility company that provides electric service to customers in several counties in California, including Los Angeles County.  (§§ 216, 218.)  Lefebvre is a resident of Los Angeles County who at all relevant times was a ratepaying customer of Edison.  Lefebvre asserts his claims on behalf of a putative class of Edison ratepayers.

## B.    *The CARE  program*

Edison is subject to regulation by the California Legislature and the PUC.  (§ 216, subd. (b).)  It also is required by statute to participate in the CARE program, "a program of assistance to low-income electric and gas customers with annual household incomes that are no greater than 200 percent of the federal poverty guideline levels."  (Former § 739.1, subd. (b)(1).)  The PUC is responsible for implementing and overseeing the CARE program.  (*Ibid.*)

All customers of public electric and gas utilities who meet the income requirements are entitled to enroll in the CARE program.  The PUC is required to "examine methods to improve CARE enrollment and participation" (former § 739.1, subd. (d)), and to work with service providers like Edison to establish enrollment "penetration goals" (former § 739.1, subd. (c)).  Lefebvre alleges that the PUC set a CARE program penetration goal of 100 percent of eligible customers who wished to participate.

By statute, the rates charged to customers participating in the CARE program "shall not exceed 80 percent of the corresponding . . . rates charged to residential customers not participating in the CARE program."  (Former § 739.1, subd. (b)(4).)  Funding for the CARE program comes both from governmental sources and "through surcharging the bills of all non-CARE ratepayers" like Lefebvre and the putative class he

_____

[2] All statutory citations in this section are to the versions of the relevant statutes that were in effect on November 21, 2013, the date the second amended complaint was filed.

3

seeks to represent. The surcharge these ratepayers pay "is tied directly to the number of participants in the CARE program; for each enrollee there is an incremental increase in the total subsidy needed to pay for that enrollee's discount." The amount of the CARE surcharge is determined by a mathematical formula and is revised annually to "take into account changes in ratepayer participation levels, residential rates, base-line allowances, average [usage], numbers of eligible households, sales forecasts, and other factors.'"

## C.    *The alleged misconduct*

Lefebvre alleges that Edison "enrolled–and used funds collected from non-CARE customers to subsidize – ratepayers whose CARE applications showed on their face that the ratepayer was financially ineligible for the CARE program because the ratepayer's household income was above the threshold levels established by law." He further alleges that by inflating the CARE program participation rolls, Edison "caused all non-CARE enrolled ratepayers to pay a higher rate than they otherwise would have, because, given the increased number of enrollees, the total amount of any given [CARE program subsidy] in any given . . . Period is necessarily higher when more enrollees are receiving the subsidy." Lefebvre alleges that enrolling ineligible customers in the CARE program pushed Edison closer to the PUC's 100 percent penetration goal for the CARE program, thereby allowing Edison to curry favor with the PUC and increasing the likelihood that the PUC would approve Edison's requests for future rate increases. Lefebvre further alleges that the ineligible enrollees increased Edison's customer base and therefore its profits, though he undermines that allegation in his brief by clarifying that "the CARE program has no financial effect on the utility companies because the cost of the CARE discount is subsidized by ratepayers who are not enrolled in the CARE program."

It is unclear from the second amended complaint when Edison allegedly engaged in this fraudulent conduct; Lefebvre alleges only that the scheme "came to light internally in 2008." At that time, Edison performed an internal audit of its CARE enrollees and found that a "substantial number" of their applications demonstrated that they were financially ineligible for the CARE program. Edison management "ordered that the audit cease, and thereafter covered up the results, never reporting their ineligible CARE

4

enrollment practice" to the PUC, the public at large, or ratepayers like Lefebvre "who were directly affected by the CARE enrollment practice." Moreover, Edison did not adjust the mathematical formula or its accounting practices to reflect or correct the problem.

**D.**  *The alleged harm*

Lefebvre alleges that if Edison had not "enrolled ineligible applicants in the CARE program and subsequently reimbursed themselves for having subsidized the rates of these ineligible applicants, the CARE Surcharge paid by all non-CARE ratepayer[s] would have been less than it was." Additionally, "no non-CARE ratepayer would have paid" the excessive surcharge if Edison had not billed them for it. Edison "never made any effort to remedy the damage to the ratepayers who had been unknowingly subsidizing financially ineligible CARE enrollees through a refund or credit."

## PROCEDURAL HISTORY

**A.**  *The qui tam action*

This suit began as a qui tam action. The original complaint, filed on November 3, 2011, alleged substantially the same facts recited above and asserted causes of action for violations of the California False Claims Act (Gov. Code, § 12651, subds. (a)(1), (a)(2) & (a)(8)); violations of the Unfair Competition Law (UCL) (Bus. & Prof. Code, § 17200 et seq.); money had and received; and accounting. The Attorney General declined to intervene in the action. The relator subsequently dismissed the qui tam allegations and requested his removal from the suit. The trial court granted both requests.

**B.**  *The first amended complaint*

Lefebvre replaced the relator as lead plaintiff and filed the first amended complaint on behalf of a putative class of Edison ratepayers on May 28, 2013. Lefebvre alleged that Edison inflated the CARE program rolls and violated the UCL by doing so. He also asserted causes of action for money had and received an accounting. Lefebvre alleged that he was injured by the "overcharges [he] paid to subsidize non-eligible CARE enrollees" and requested equitable relief in the form of restitution or disgorgement.

5

Edison demurred to all three causes of action asserted in the first amended complaint. As to each, Edison contended that the court lacked subject matter jurisdiction (Code Civ. Proc., § 430.10, subd. (a)), that the first amended complaint failed to state facts sufficient to constitute a cause of action (Code Civ. Proc., § 430.10, subd. (e)), and that resolution of the first amended complaint should be stayed under the primary jurisdiction doctrine. As is pertinent here, Edison argued the court lacked subject matter jurisdiction to hear the case under section 532, which prohibits public utilities from "refund[ing] or remit[ting], directly or indirectly, in any manner or by any device, any portion of the rates, tolls, rentals, and charges" specified in a filed tariff, and section 1759, subdivision (a), which deprives superior courts of jurisdiction to "enjoin, restrain, or interfere with" the PUC in the performance of its official duties. Edison also argued that, "at a minimum," the court should stay the proceedings under the primary jurisdiction doctrine (see *Farmers Insurance Exchange v. Superior Court* (1992) 2 Cal.4th 377, 390) to allow the PUC an opportunity to evaluate Lefebvre's claims in the first instance.

Edison also requested that the court take judicial notice of 30 PUC documents pursuant to Evidence Code sections 451 and 452. The documents, which pertained to the PUC's supervision of the CARE program, spanned nearly 1500 pages and included rate tariffs; filings; and decisions, orders, and resolutions promulgated by the PUC. Lefebvre did not oppose the request, which the trial court granted, along with Edison's subsequent supplemental request for judicial notice.

The trial court, Judge Lee Smalley Edmon presiding, sustained the demurrer with leave to amend. Judge Edmon concluded the entire action was precluded by section 532 because Lefebvre requested relief barred by its terms, namely remittance of "the difference between the filed rate and the amount he believes he and the putative class should have paid." Judge Edmon did not address any of Edison's other arguments, though she indicated at the hearing on the demurrer that she was "also persuaded by a lot of the arguments about 1759." Judge Edmon gave Lefebvre 30 days to file an amended complaint.

6

**C.** *The second amended complaint*

Lefebvre filed his second amended complaint on November 21, 2013. In addition to repleading the three causes of action from the first amended complaint, Lefebvre asserted four new causes of action. Two of those causes of action, for violation of the UCL and imposition of a constructive trust, were expressly aimed at Edison's alleged misconduct in subsidizing ineligible CARE program participants and receiving money from ratepayers like him in order to do so. The third new cause of action, fraud, alleged that Edison misled and defrauded the PUC by failing to disclose its enrollment of financially ineligible customers in the CARE program and making false representations to the PUC regarding the current and projected amounts of the subsidies provided to CARE enrollees. The fourth new cause of action alleged that Edison's misconduct violated section 2106, which imposes upon public utilities liability for "any act, matter, or thing prohibited or declared unlawful," or the omission of "any act, matter, or thing required to be done." In addition to damages, Lefebvre prayed for the disgorgement of all monies wrongfully obtained, an injunction ordering the imposition of a constructive trust on all monies wrongfully withdrawn from its books to fund the subsidies given to ineligible CARE program, and an injunction requiring Edison to return those funds to its books.

Edison demurred to all seven causes of action. As before, Edison contended that the court lacked subject matter jurisdiction (Code Civ. Proc., § 430.10, subd. (a)), that the second amended complaint failed to state facts sufficient to constitute a cause of action (Code Civ. Proc., § 430.10, subd. (e)), and that resolution of the second amended complaint should be stayed under the primary jurisdiction doctrine. Edison reiterated the arguments it made in connection with its previous demurrer, namely that the suit was barred by section 532 because it sought relief tantamount to a refund and that the superior court lacked jurisdiction to hear the suit under section 1759. Edison also requested that the court take judicial notice of four additional rate tariffs and the transcript of the demurrer hearing before Judge Edmon. Lefebvre did not oppose that request, which the trial court granted.

7

In his opposition to the demurrer, Lefebvre argued that he was not seeking a refund of a filed rate but rather the return of "his future, beneficial interest" in the account Edison uses to deposit CARE surcharges and pay out subsidies, which would affect only "*future and yet-to-be-filed* rates." He further contended that his claims were not jurisdictionally barred by section 1759 because the PUC's oversight of CARE program enrollment practices was minimal, his claims were predicated upon past violations for which the PUC could not offer relief, and a judgment in his favor would not hinder or frustrate the PUC's policies concerning the CARE program.

The trial court, Judge Amy D. Hogue presiding, again sustained the demurrer, this time without leave to amend. Like Judge Edmon, Judge Hogue concluded Lefebvre's claims were barred by section 532 because they sought an unlawful refund or reduction of a filed tariff. Judge Hogue further concluded that "[n]o amount of artful pleading will alter the basic fact that the gravamen of the actions [is] that a filed tariff was too high and that Plaintiff and putative class members are entitled to a refund (whether that refund is whole or partial, direct or indirect, immediate or time-delayed)," and therefore denied leave to amend. Judge Hogue did not address Edison's section 1759 argument, stating instead that the issue of jurisdiction need not be resolved because the suit "is prohibited by section 532 notwithstanding section 1759." Judge Hogue also noted, however, that she "share[d] Judge Edmon's concerns under section 1759."

Judge Hogue dismissed Lefebvre's suit with prejudice on April 7, 2014. Lefebvre timely appealed.

## DISCUSSION

### A. *Standard of review*

"'A demurrer tests the legal sufficiency of the complaint. . . .'" (*Flying Dutchman Park, Inc. v. City and County of San Francisco* (2001) 93 Cal.App.4th 1129, 1134.) The standard governing our review of an order sustaining a demurrer is well established. We review the order de novo, "exercising our independent judgment about whether the complaint states a cause of action as a matter of law. [Citations.]" (*Ibid.*) "'"We treat the demurrer as admitting all material facts properly pleaded, but not contentions,

8

deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff.' [Citations.]" (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126.) We affirm a judgment based on an order sustaining a general demurrer if any one of multiple grounds for the demurrer is well taken, regardless of whether it was the ground on which the trial court relied. (*Casey v. U.S. Bank Nat. Assn.* (2005) 127 Cal.App.4th 1138, 1144.)

**B.    *Analysis***

One of the several grounds on which Edison demurred was that the trial court lacked subject matter jurisdiction to adjudicate Lefebvre's claims. We agree with Edison that Lefebvre's claims lie within the exclusive jurisdiction of the commission.

**1.    *General principles of subject matter jurisdiction***

"Subject matter jurisdiction is a fundamental requirement for judicial consideration of claims." (*Saffer v. JP Morgan Chase Bank* (2014) 225 Cal.App.4th 1239, 1248.) "'The principle of "subject matter jurisdiction" relates to the inherent authority of the court involved to deal with the case or matter before it.' [Citation.] Thus, in the absence of subject matter jurisdiction, a trial court has no power 'to hear or determine [the] case.' [Citation.] And any judgment or order rendered by a court lacking subject matter jurisdiction is 'void on its face. . . .' [Citation.]" (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 196.) For these reasons, "an alleged lack of subject matter jurisdiction must be addressed whenever it comes to a court's attention." (*Saffer v. JP Morgan Chase Bank*, *supra*, 225 Cal.App.4th at p. 1246.) Moreover, it ordinarily is addressed as a threshold matter, as its absence deprives the

9

court of authority to adjudicate the merits of the dispute.  (See *Holiday Matinee, Inc. v. Rambus, Inc.* (2004) 118 Cal.App.4th 1413, 1422; cf. *Young v. Tri-City Healthcare District* (2012) 210 Cal.App.4th 35, 53 [assuming arguendo that trial court retained subject matter jurisdiction before addressing the merits].)

### 2. *Section 1759 is jurisdictional*

Edison argued below (and contends here) that both sections 532 and 1759 deprived the court of subject matter jurisdiction to adjudicate Lefebvre's claims.  As we explain below, however, of the two statutes invoked by Edison, only section 1759 is jurisdictional.  We therefore begin our analysis with that provision, which the parties have fully briefed.

### a. *The PUC and the Public Utilities Act*

As the Supreme Court explained in *San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893 (*Covalt*), "'[t]he commission is a state agency of constitutional origin with far-reaching duties, functions and powers.  (Cal. Const., art. XII, §§ 1-6.)  The Constitution confers broad authority on the commission to regulate utilities, including the power to fix rates, establish rules, hold various types of hearings, award reparation, and establish its own procedures.'  (*Id.* §§ 2, 4, 6.)"  (*Covalt*, *supra*, 13 Cal.4th at pp. 914-915.)  "The Constitution also gives the Legislature plenary power to confer additional authority and jurisdiction upon the commission, which the Legislature did by enacting the Public Utilities Act (§ 201 et seq.)."  (*Wilson v. Southern California Edison Company* (2015) 234 Cal.App.4th 123, 142-143 (*Wilson*).)  The Public Utilities Act "vests the commission with broad authority to 'supervise and regulate every public utility in the State' (§ 701) and grants the commission numerous specific powers for the purpose," as well as the authority to "'*do all things*, whether specifically designated in [the Public Utilities Act] *or in addition thereto*, which are necessary and convenient' in the exercise of its jurisdiction over public utilities.  [Citation.]"  (*Covalt*, *supra*, 13 Cal.4th at p. 915.)

The Legislature also has the power to "establish the manner and scope of review of commission action in a court of record."  (Cal. Const., art. XII, § 5.)  Pursuant to this

10

authority, "the Legislature enacted article 3 of chapter 9 of the Public Utilities Act, entitled 'Judicial Review.' (§ 1756 et seq.)" (*Covalt*, *supra*, 13 Cal.4th at p. 915.) That article sets forth "a method of judicial review that is narrow in both 'manner and scope.'" (*Ibid.*) Under the provisions of section 1759, the Legislature restricted review of a commission decision to an action filed directly in the Supreme Court or court of appeal by means of a petition for writ of review. (*Ibid.*; *Wilson*, *supra*, 234 Cal.App.4th at p. 143, fn. 21.) Additionally, "the Legislature then made it clear in section 1759 of the Public Utilities Act that no other court has jurisdiction either to review or suspend the commission's decisions or to enjoin or otherwise 'interfere' with the commission's performance of its duties." (*Covalt*, *supra*, 13 Cal.4th at p. 916.)

### b. *Section 1759*

As the above discussion makes clear, section 1759 was "designed to protect the PUC's constitutional and statutory authority to regulate utilities." (*Wilson*, *supra*, 234 Cal.App.4th at p. 142.) Section 1759, subdivision (a), provides: "No court of this state, except the Supreme Court and the court of appeal, to the extent specified in this article, shall have jurisdiction to review, reverse, correct, or annul any order or decision of the [Public Utilities] commission or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the commission in the performance of its official duties, as provided by law and the rules of court."

Section 1759 explicitly limits the subject matter jurisdiction of trial courts. (*Wilson*, *supra*, 234 Cal.App.4th at p. 143.) By its terms, it "divests trial courts of jurisdiction to entertain lawsuits that would interfere with the PUC's regulation of utilities." (*Ibid*.) This distinguishes it from section 532, which governs the behavior of public utilities. (See *Empire West v. Southern California Gas Co.* (1974) 12 Cal.3d 805, 809; *Cundiff v. GTE California, Inc.* (2002) 101 Cal.App.4th 1395, 1409, fn. 9.) Section 532, entitled "Compliance with schedule," neither facially nor substantively concerns jurisdiction. Instead, it provides in relevant part that no public utility is authorized to "refund or remit, directly or indirectly, in any manner or by any device, any portion of the rates, tolls, rentals, and charges so specified" in its tariffs. In other words, it precludes

11

public utilities from charging rates different from those provided in their tariffs. (*Cundiff*, *supra*, 101 Cal.App.4th at p. 1409, fn. 9.) Although claims seeking relief that necessarily violates section 532 may fail as a matter of law (see *Empire West*, *supra*, 12 Cal.3d at pp. 807-808, 811-812; *Cellular Plus, Inc. v. Superior Court* (1993) 14 Cal.App.4th 1224, 1249 (*Cellular Plus*)), there is no indication that they fail for want of jurisdiction. Edison has not cited any authority supporting its assertion to the contrary. We accordingly focus our attention on section 1759 rather than section 532.

The jurisdictional limitations in section 1759 place it in tension with another provision of the Public Utilities Act, section 2106, which authorizes "the traditional private remedy of an action for damages" (*Covalt*, *supra*, 13 Cal.4th at p. 916) and provides that such actions "may be brought in any court of competent jurisdiction by any corporation or person" (§ 2106). To reconcile the conflict between these two provisions, our Supreme Court has "declared the primacy of section 1759 and the correspondingly limited role of section 2106." (*Covalt*, *supra*, 13 Cal.4th at p. 917.) In *Waters v. Pacific Telephone Co.* (1974) 12 Cal.3d 1, 4, the Court held that "in order to resolve the potential conflict between sections 1759 and 2106, the latter section must be construed as limited to those situations in which an award of damages would not hinder or frustrate the commission's declared supervisory and regulatory policies." The Court in *Covalt* further clarified that actions for damages under section 2106 are "barred by section 1759 not only when an award of damages would directly contravene a specific order or decision of the commission, i.e., when it would 'reverse, correct, or annul' that order or decision, but also when an award of damages would simply have the effect of undermining a general supervisory or regulatory policy of the commission, i.e., when it would 'hinder' or 'frustrate' or 'interfere with' or 'obstruct' that policy." (*Covalt*, *supra*, 13 Cal. 4th at p. 918.) "On the other hand, superior courts are not precluded from acting in aid of, rather than in derogation of, the PUC's jurisdiction." (*Hartwell Corp. v. Superior Court* (2002) 27 Cal.4th 256, 275 (*Hartwell*).) Synthesizing and applying these principles, courts generally have held that damages actions challenging "a ruling of the commission on a single matter such as its approval of a tariff or a merger" would not "'hinder'" a

12

"'policy'" of the commission and may proceed. (*Covalt*, *supra*, 13 Cal.4th at pp. 918-919.) "But when the relief sought would have interfered with a broad and continuing supervisory or regulatory program of the commission, the courts have found such a hindrance and barred the action under section 1759." (*Id.* at p. 919.)

3. **Section 1759 bars Lefebvre's claims**

a. **The Covalt test**

In *Covalt*, the Supreme Court developed a three-part test for courts to employ when determining whether an action brought pursuant to section 2106 is precluded by section 1759. (See *Covalt*, *supra*, 13 Cal.4th at pp. 923, 926, 935.) The test consists of three questions: (1) whether the PUC has the authority to adopt a policy on the issue in question; (2) whether the PUC has exercised its regulatory authority governing the issue in question; and (3) whether the superior court action would hinder or interfere with that exercise of regulatory authority. (*Ibid.*; see also *Guerrero v. Pacific Gas & Electric Company* (2014) 230 Cal.App.4th 567, 572 (*Guerrero*).) If all three questions are answered in the affirmative, section 1759 divests the superior court of jurisdiction over the action. (*Hartwell, supra,* 27 Cal.4th at p. 266.)

b. **Application of the Covalt test**

The parties agree on the nature of the issues in question; both Lefebvre identify them as ratemaking and the CARE program. They also agree that, as to these issues, the first two questions of the *Covalt* test must be answered in the affirmative. Indeed, Lefebvre argues only that the "claims asserted in the present case fall outside the purview of section 1759 because the third element of the *Covalt* test is not satisfied." Thus, for purposes of this appeal, we operate from the premise that the PUC possesses authority to adopt policies regarding ratemaking and the CARE program and has exercised that authority. We concern ourselves only with the third question, whether Lefebvre's action in superior court would hinder or interfere with the commission's exercise of its regulatory authority.

Lefebvre contends that his lawsuit will not hinder the PUC's exercise of its regulatory authority over ratemaking and the CARE program because he is not "seeking

13

to change the way the PUC administers the CARE program, or any of the utility rates the PUC has approved." Instead, he characterizes his lawsuit as one challenging the manner in which Edison "manipulated the implementation" of the CARE program surcharge. He contends he is "seeking damages from Edison for the harm already caused by Edison's fraudulent and unfair conduct." Thus, he argues his claims are akin to those permitted in *Hartwell*, *supra*, 27 Cal.4th at p. 276, *Cellular Plus*, *supra*, 14 Cal.App.4th at p. 1246, *Cundiff*, *supra*, 101 Cal.App.4th at pp. 1406-1407, and *Wilson*, *supra*, 234 Cal.App.4th at pp. 149-151. Edison distinguishes these cases and argues that Lefebvre's claims are more analogous to those over which jurisdiction was found lacking in *Guerrero*, *supra*, 230 Cal.App.4th at pp. 576-577 and *Hartwell*, *supra*, 27 Cal.4th at pp. 277-278. Our analysis is generally in line with Edison's.

In *Hartwell*, plaintiffs alleged "that certain water companies provided them unsafe drinking water causing death, personal injury, and property damage." (*Hartwell*, *supra*, 27 Cal.4th at p. 260.) Applying the *Covalt* test, the Supreme Court concluded that "the PUC's regulation of water quality and safety does not preempt damage claims alleging violations of federal and state drinking water standards against the water providers subject to PUC regulation, but that the remaining claims against those water providers are preempted." (*Ibid.*) The Supreme Court explained this mixed result in *People ex rel. Orloff v. Pacific Bell* (2003) 31 Cal.4th 1132, 1147 (*Orloff*). "[B]ecause the PUC relied upon certain water quality standards as a benchmark in approving water rates charged by public utilities, challenges in the civil action to the adequacy of those standards, and claims for damages allegedly caused by unhealthy water permitted by the standards, would interfere with broad and continuing regulatory programs of the PUC such as ratemaking for public utilities. In addition, the PUC had provided a safe harbor for utilities meeting these water quality standards, and our decision observed that a determination by the superior court that the existing standards were inadequate would undermine this policy of the PUC by holding the utilities liable for damages caused by their failure to undertake action that the PUC repeatedly had determined was not required." (*Orloff*, *supra*, 31 Cal.4th at p. 1147.) The claims seeking injunctive relief for

14

current violations of water quality standards similarly were barred, "because an injunction predicated upon a finding of such violations would conflict with the decision of the PUC that the defendant utilities presently were in compliance with the standards, and that no further inquiries or evidentiary hearings regarding compliance were required." (*Ibid.*, citing *Hartwell*, *supra*, 27 Cal.4th at p. 278.)

The Court found that the claims alleging damages caused by water that did *not* satisfy the applicable water standards were not precluded by section 1759, however, "even though the PUC had issued a decision including a finding that, for the previous 25 years, water provided by the defendant utilities substantially *did* comply with the water standards." (*Orloff, supra*, 31 Cal.4th at p. 1147.) The court explained that this conclusion rested on three circumstances: "(1) the investigation by the PUC that led to the decision was characterized by the commission as a process designed to gather information, rather than as a rulemaking proceeding; (2) even though information gathered in the investigation and reported in the decision might have resulted in a rulemaking or enforcement proceeding against the utilities, the finding by the PUC that the utilities had complied with water quality standards did not constitute 'part of a broad and continuing program to regulate . . . water quality' and thus the program 'was not part of an identifiable "broad and continuing supervisory or regulatory program of the commission" [citation] related to such routine PUC proceedings as ratemaking [citation] or approval of water quality treatment facilities'; and (3) the civil action sought damages for injuries caused by water that had failed to meet water standards in prior years, whereas any finding by the PUC regarding past compliance would be relevant only to a future remedial program designed to halt current and ongoing violations, rather than to redress injuries for past violations, because the PUC could not provide relief for such past violations." (*Id.* at pp. 1147-1148.)

Lefebvre emphasizes the third *Hartwell* circumstance cited by *Orloff*, arguing that because he seeks damages and injunctive relief to remedy past violations of standards promulgated by the PUC, his claims are not barred by section 1759. This narrow focus ignores the other two factors the Court emphasized. Here, the parties do not dispute that

15

the PUC has engaged in extensive rulemaking regarding the CARE program and the rate structure that supports it.  That is, the PUC has an identifiable broad and continuing supervisory or regulatory program governing CARE enrollment policies and the calculation of CARE surcharges.  The plethora of PUC documents of which the trial court took judicial notice demonstrate that the PUC has established policies and procedures governing CARE program eligibility and enrollment:  it requires Edison to submit detailed estimations and budgets regarding the CARE program, it requires Edison to report on its tariffs any "CARE Subsidy (Over)/Under Collection," and it reviews the activity in Edison's CARE program accounting records on a monthly and annual basis.  These documents also demonstrate that the PUC monitors the number of CARE program applicants and enrollees, as well as Edison's efforts to verify applicant eligibility and de-enroll ineligible participants.

Moreover, the PUC has the power to award reparations for rates that are unreasonable, excessive, or discriminatory, as well as to assess fines and penalties.  (*Davis v. Southern California Edison Company* (2015) 236 Cal.App.4th 619, 636.)  "It is inconceivable that the Legislature intended the PUC would be powerless to award reparations where a public utility obtained a tariff rate by fraudulent means. . . .  [T]he PUC in the exercise of its equitable jurisdiction must be able to fashion a remedy in the event of fraud committed by a public utility during the ratemaking process."  (*Wise v. Pacific Gas & Electric Co.* (1999) 77 Cal.App.4th 287, 300.)  We are not persuaded by Lefebvre's analogy to the permissible claims in *Hartwell*.

We likewise find distinguishable *Cellular Plus*.  There, consumers alleged that two cellular phone service providers engaged in price fixing in violation of the Cartwright Act.  (*Cellular Plus*, *supra*, 14 Cal.App.4th at pp. 1230-1231.)  Although the trial court concluded that the claims were barred by section 1759, the court of appeal reversed.  It concluded the plaintiffs' price fixing claim could not "'hinder or frustrate' the PUC's supervisory or regulatory policies," because the plaintiffs were seeking treble damages and injunctive relief under the Cartwright Act and did not "seek any relief requiring the PUC to change any rates it has approved."  (*Id.* at p. 1246.)  Here, however,

16

Lefebvre is at bottom seeking the diminution or refund of a tariffed surcharge the PUC approved in the course of its extensive oversight of the CARE program. Such relief would hinder and frustrate the PUC's exercise of its regulatory authority, and would penalize Edison for assessing surcharges expressly authorized by the PUC. (See *Guerrero*, *supra*, 230 Cal.App.4th at p. 576.)

Lefebvre attempts to liken his case to *Cundiff* and *Wilson*, but those cases also are inapposite. In *Cundiff*, the plaintiffs challenged a phone company's practice of charging customers for the rental of obsolete or nonexistent telephone equipment. (*Cundiff*, *supra*, 101 Cal.App.4th at p. 1402.) They alleged that the phone company violated the UCL and perpetrated fraud directly upon them by failing to inform them "of the true nature and benefits of their monthly 'equipment rental' charges." (*Ibid.*) The court of appeal concluded the suit did not interfere with the PUC's exercise of regulatory authority because it was not aimed at the PUC's decision to allow the company to rent telephone equipment to its customers. Rather, the allegations challenged the "*manner* in which defendants billed them for rental of telephones, specifically, the alleged lack of information given to plaintiffs about the rental charge made each month by defendants." (*Id.* at p. 1406.) The "gist of the suit [was] that if plaintiffs had been adequately informed about the nature of the equipment rental charge that they repeatedly paid, they would have chosen not to pay it." (*Ibid.*) The "gist" of the suit here, which involves a fraud allegedly perpetrated upon the PUC, is that the tariffed CARE surcharges approved by the PUC were too high. This renders it more closely analogous to the suit in *Guerrero*, which the court found barred by section 1759 because its request for "disgorgement, restitution, and damages for the misappropriation of PUC approved funds interferes with the PUC's ongoing authority over natural gas rates." (*Guerrero*, *supra*, 230 Cal.App.4th at p. 574.)

In *Wilson*, we held that a suit alleging that Edison "failed to properly supervise, secure, operate, maintain, or control the electrical substation next door to plaintiff's house . . . allowing uncontrolled stray electrical currents to enter the home" (*Wilson*, *supra*, 234 Cal.App.4th at p. 129), was not barred by section 1759 because "the PUC has not

17

exercised its authority to adopt a policy regarding the issues in this lawsuit" (*id.* at p. 130). That is, we concluded that superior court jurisdiction was proper because the *second* element of the *Covalt* test was not satisfied. (See *Covalt*, *supra*, 13 Cal.4th at p. 926.) At issue in this case, however, is the *third* question of the test, whether the maintenance of a suit in superior court would hinder or interfere with the PUC's exercise of its authority. *Wilson* therefore is not pertinent to this case.

In our view, this case is more closely analogous to *Guerrero*, *supra*, 230 Cal.App.4th 567. In that case, the plaintiffs alleged that a utility company made deceptive misrepresentations to the PUC about the amount of revenue it required to provide safe and reliable natural gas service and sought restitution and disgorgement of the excessive revenue the utility collected and misappropriated. (*Guerrero*, *supra*, 230 Cal.App.4th at p. 569.) The trial court sustained the utility's demurrer on section 1759 grounds, and the court of appeal affirmed. The court of appeal rejected plaintiffs' contentions that the third element of the *Covalt* test was not satisfied because ongoing PUC proceedings were limited in scope, were forward-rather than backward-looking, and included no consideration of whether ratepayers should be afforded a remedy for the alleged misappropriation. (See *Guerrero*, *supra*, 230 Cal.App.4th at p. 572.) The court concluded the plaintiffs' claims interfered with the PUC's exercise of authority over natural gas rates. (*Id.* at p. 574.) It reasoned that a superior court order awarding restitution would "direct refunds of rates approved by the PUC" and "would, in effect, hold [the utility] liable for charging rates expressly authorized by the PUC, and that remain under the PUC's consideration." (*Id.* at p. 576.) Additionally, the court emphasized that section 1759 was applicable "even though the PUC has not considered the precise claim advanced in their complaint" because "ratemaking has been an integral component of the PUC's regulation and supervision of [the utility's] natural gas operations since at least 1997." (*Id.* at pp. 576-577.) The same rationales apply here and cannot be overcome by amendments to the pleading. (See *Zelig v. County of Los Angeles*, *supra*, 27 Cal.4th at p. 1126.) The court correctly sustained Edison's demurrer without leave to amend.

## DISPOSITION

"[I]rrespective of the merits of [Lefebvre]'s other challenges—and notwithstanding the nonjurisdictional basis of the trial court's decision—the [Second Amended] Complaint was demurrable because of the absence of jurisdiction over the subject matter of the action." (*Holiday Matinee, Inc. v. Rambus, Inc.*, *supra*, 118 Cal.App.4th at p. 1427.)  Moreover, the court did not abuse its discretion in declining leave to amend.  Accordingly, the judgment of the trial court is affirmed.  Edison is awarded its costs on appeal.

**CERTIFIED FOR PUBLICATION**


COLLINS, J.

We concur:


EPSTEIN, P. J.


WILLHITE, J.

19